PEOPLE v CARP

Docket No. 307758. Submitted October 16, 2012, at Lansing. Decided
November 15, 2012, at 9:05 a.m. Leave to appeal sought.

Raymond C. Carp was convicted in 2006 by a jury in the St. Clair
Circuit Court of first-degree murder, armed robbery, larceny in
a building, and larceny of property worth $1,000 or more but
less than $20,000. The court, James P. Adair, J., sentenced
defendant to concurrent terms of mandatory life imprisonment
without parole for the first-degree murder conviction, 15 to 30
years in prison for the armed robbery conviction and 1 to 4 years
in prison for the larceny convictions. The Court of Appeals,
SCHUETTE, P.J., and ZAHRA and OWENS, JJ., affirmed defendant's
convictions and sentences on direct appeal in an unpublished
opinion per curiam, issued December 30, 2008 (Docket No.
275084), and the Supreme Court denied his application for leave
to appeal, 483 Mich 1111 (2009). The circuit court denied
defendant's subsequent motion for relief from the judgment,
and the Court of Appeals denied his application for delayed
leave to appeal in an unpublished order, entered June 8, 2012
(Docket No. 307758). The Court of Appeals subsequently
granted defendant's motion for reconsideration in an unpub-
lished order, entered August 9, 2012 (Docket No. 307758), to
address whether defendant was entitled to resentencing follow-
ing the United States Supreme Court's decision in *Miller v
Alabama*, 567 US ___; 132 S Ct 2455; 183 L Ed 2d 407 (2012).

The Court of Appeals *held*:

1. The Eighth Amendment requires that juveniles be treated
differently than adults when being sentenced. The *Miller* Court
enunciated a new rule when it held that the Eighth Amendment's
prohibition against cruel and unusual punishment prohibits a
sentencing scheme that mandates life in prison without parole for
juvenile offenders. Mandatorily sentencing a juvenile offender to
life in prison without parole would not be proportionate because it
would not allow the sentencing court to consider the special
characteristics of youth or the circumstances of the offense when
imposing sentence.

2. *Miller* does not apply retroactively to cases on collateral review. An appeal of a judgment of conviction is final upon the conclusion of direct review or the expiration of the time for seeking that review in federal or state court. A newly announced rule of law applies to all criminal cases still pending on direct review. Unless an exception applies, new constitutional rules of criminal procedure may not be applied retroactively on collateral review, which occurs when cases have become final before the new rule was announced. A new rule should be applied retroactively on collateral review if it requires the observance of those procedures that are substantive or if it is a watershed rule of criminal procedure that implicates the fundamental fairness and accuracy of the criminal proceeding, such as the right to counsel. A watershed rule is one that is necessary to prevent an impermissibly large risk of an inaccurate conviction and alters the bedrock procedural elements essential to the fairness of a proceeding. The *Miller* Court's prohibition of mandatory life in prison without parole for juvenile homicide offenders applies to cases currently pending on direct appeal, but may not be applied retroactively to those cases on collateral reviews. The rule was procedural, not substantive in nature because it did not categorically bar a penalty but instead required that sentencing courts follow a certain process. It did not alter the elements necessary for a homicide conviction or the range of conduct or the class of person that the law punishes. Nor was it a watershed rule. *Miller* dealt exclusively with the accuracy of sentencing and did not pertain to criminal trial procedures leading to a conviction.

3. A state may accord broader effect to a new rule of criminal procedure than federal retroactivity jurisprudence accords. In Michigan determining retroactivity requires consideration of the purpose of the new rule, the general reliance on the old rule, and the effect of retroactive application on the administration of justice. A new rule of criminal procedure may be retroactively applied on collateral review when it concerns the ascertainment of guilt or innocence, but a new rule of procedure that does not affect the integrity of the fact-finding process should be given prospective effect. With respect to reliance, the defendant must have suffered actual harm from relying on the old rule. Finally, it must be determined whether retroactive application of the new rule would undermine the state's strong interest in finality of the criminal justice process. Under Michigan law, the *Miller* Court's prohibition of mandatory life in prison without parole for juvenile homicide offenders is not subject to retroactive application for cases on collateral review. The *Miller* decision

did not concern the ascertainment of guilt or innocence and did not affect the integrity of the fact-finding process. Because *Miller* did not categorically ban life without parole sentences for juveniles convicted of a homicide offense, defendant cannot prove actual harm if the new rule was not applied retroactively. Judicial resources would be better directed to those defendants currently charged or those cases pending on direct review.

4. *Miller* is applicable to those cases currently pending or on direct review. It requires that sentencing courts impose an individualized and proportionate sentence by considering the characteristics of youth associated with a juvenile defendant, as well as the details of the offense, when determining whether to sentence a juvenile convicted on a homicide offense to life in prison with or without the possibility of parole. At sentencing, a court should consider (1) the character and record of the defendant and the circumstances of the offense, (2) the chronological age of the minor defendant, (3) the background and mental and emotional development of a youthful defendant, (4) the family and home environment, (5) the circumstances of the homicide offense, including the extent of the juvenile defendant's participation in the offense and the way family and peer pressures might have affected him or her, (6) whether the juvenile defendant might have been charged and convicted of a lesser offense if not for the incompetencies associated with youth, and (7) the potential for rehabilitation. The Parole Board may not ignore the sentencing court's determination when parole eligibility arises.

5. MCL 791.234(6)(a), which excludes any prisoner serving a life sentence for first-degree murder from eligibility for parole, is unconstitutional as written and as applied to juvenile offenders convicted of homicide because it fails to acknowledge a sentencing court's discretion to determine, as required by *Miller*, that a convicted juvenile homicide offender may be eligible for parole. The *Miller* decision applies to all juveniles under the age of 18 at the time the homicide offense occurred. Even though relevant Michigan court rules and statutes concerning sentencing—MCR 6.903(E), MCL 600.606(1), and MCL 764.27—define a "juvenile" as a person 14 years of age or older but less than 17 years of age, Michigan courts are required to follow the *Miller* Court's determination that for sentencing purposes a juvenile is any person under the age of 18 years at the time of the crime.

Affirmed.

1. CONSTITUTIONAL LAW — SENTENCING AND PUNISHMENT — JUVENILE OFFENDERS — CRUEL AND UNUSUAL PUNISHMENT.

The Eighth Amendment requires that juveniles under the age of 18 be treated differently than adults when being sentenced; a sentencing scheme that mandates life in prison without parole for juvenile offenders constitutes cruel and unusual punishment under the Eighth Amendment; mandatorily sentencing a juvenile offender to life in prison without parole is not proportionate because it would not allow the sentencing court to consider the special characteristics of youth or the circumstances of the offense when imposing sentence; at sentencing, a court should consider (1) the character and record of the defendant and the circumstances of the offense, (2) the chronological age of the minor defendant, (3) the background and mental and emotional development of a youthful defendant, (4) the family and home environment, (5) the circumstances of the homicide offense, including the extent of the juvenile defendant's participation in the offense and the way family and peer pressures might have affected him or her, (6) whether the juvenile defendant might have been charged and convicted of a lesser offense if not for the incompetencies associated with youth, and (7) the potential for rehabilitation.

2. CONSTITUTIONAL LAW — SENTENCING AND PUNISHMENT — JUVENILE OFFENDERS — RETROACTIVE APPLICATION — COLLATERAL REVIEW.

Unless an exception applies, new constitutional rules of criminal procedure may not be applied retroactively on collateral review; a new rule should be applied retroactively on collateral review if it requires the observance of those procedures that are substantive or if it is a watershed rule of criminal procedure that implicates the fundamental fairness and accuracy of the criminal proceeding; a watershed rule is one that is necessary to prevent an impermissibly large risk of an inaccurate conviction and alters the bedrock procedural elements essential to the fairness of a proceeding; under federal and Michigan law, the prohibition against mandatory life in prison without parole for juvenile homicide offenders applies to cases currently pending on direct appeal, but may not be applied retroactively to criminal cases on collateral review.

3. STATUTES — SENTENCING AND PUNISHMENT — JUVENILE OFFENDERS — CONSTITUTIONAL LAW.

MCL 791.234(6)(a), which excludes any prisoner serving a life sentence for first-degree murder from eligibility for parole, is unconstitutional as written and as applied to juvenile offenders

under the age of 18 convicted of homicide because it fails to acknowledge a sentencing court's discretion to determine that a convicted juvenile homicide offender may be eligible for parole.

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, *Michael D. Wendling*, Prosecuting Attorney, and *Timothy K. Morris*, Assistant Prosecuting Attorney, for the people.

*Selby Law Firm, PLLC* (by *Patricia L. Selby*), for defendant.

Amici Curiae:

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, *B. Eric Restuccia*, Deputy Solicitor General, and *Richard A Bandstra*, Chief Legal Counsel, for the Attorney General.

*Dawn Van Hoek, Brett M. DeGroff, Marla R. Mc-Cowan, Michael L. Mittlestat, Johnathon Sacks*, and *Christopher M. Smith* for the State Appellate Defender Office.

*David S. Leyton, Kym L. Worthy*, and *Timothy A. Baughman*, for the Prosecuting Attorneys Association of Michigan.

*Stuart G. Friedman* for the Criminal Defense Attorneys of Michigan.

*Daniel S. Korobkin, Michael J. Steinberg, Kary L. Moss, Kimberly A. Thomas*, and *Deborah L. LaBelle* for the American Civil Liberties Union, the American Civil Liberties Union of Michigan, and the University of Michigan Law School Juvenile Justice Clinic.

Before: TALBOT, P.J., and FITZGERALD and WHITBECK, JJ.

TALBOT, P.J. A jury convicted defendant, Raymond Curtis Carp, of first-degree murder,[1] armed robbery,[2] larceny in a building,[3] and larceny of property worth $1,000 or more but less than $20,000.[4] The trial court sentenced Carp to mandatory life imprisonment without parole for the first-degree murder conviction, 15 to 30 years' imprisonment for the armed robbery conviction and 1 to 4 years' imprisonment for both larceny convictions, to be served concurrently. Following an appeal as of right, this Court affirmed his convictions and sentences.[5] The Michigan Supreme Court denied Carp's subsequent application for leave to appeal.[6] Following the trial court's denial of his motion for relief from the judgment, Carp again applied to this Court for delayed leave to appeal, which this Court denied.[7] Subsequently, this Court granted Carp's motion for reconsideration of that order[8] to address his contention of entitlement to resentencing following the recent decision by the United States Supreme Court in *Miller v Alabama*.[9] We affirm.

### I. STANDARD OF REVIEW

"[W]hether a United States Supreme Court decision

---

[1] MCL 750.316.

[2] MCL 750.529.

[3] MCL 750.360.

[4] MCL 750.356(3)(a).

[5] *People v Carp*, unpublished opinion per curiam of the Court of Appeals, issued December 30, 2008 (Docket No. 275084).

[6] *People v Carp*, 483 Mich 1111 (2009).

[7] *People v Carp*, unpublished order of the Court of Appeals, entered June 8, 2012 (Docket No. 307758).

[8] *People v Carp*, unpublished order of the Court of Appeals, entered August 9, 2012 (Docket No. 307758).

[9] *Miller v Alabama*, 567 US ___; 132 S Ct 2455; 183 L Ed 2d 407 (2012).

applies retroactively presents a question of law that we review de novo."[10]

## II. *PEOPLE v CARP*

The events leading to Carp's conviction involved the murder of Mary Ann McNeely in her home on May 31, 2006. At that time, Carp was 15 years of age. Carp's 22-year-old half-brother,[11] Brandon Gorecki, began to reside with the victim after his mother told him to leave the family residence because of his continued drug use. Their mother permitted Carp to visit his half-brother and spend the night at the victim's home. That night, Gorecki became involved in a verbal argument and physical confrontation with his girlfriend at the victim's residence. According to Gorecki's girlfriend, the victim intervened, affording the girlfriend an opportunity to leave the premises.

Following this confrontation, Carp and Gorecki left the victim's residence but returned a short time later. Gorecki and the victim began to argue, and the argument evolved into a physical confrontation. Although Gorecki denied an ability to recall the events that transpired due to his use of drugs and alcohol, he admitted stabbing the victim more than once in the neck area and also striking her in the head with a mug. According to Gorecki, during this confrontation, Carp "threw a mug at the victim and closed the drapes." Gorecki acknowledged trying to clean up the victim's blood and removing electronic equipment from the victim's home. Gorecki also took the victim's truck while Carp accompanied him.

The medical examiner indicated that the victim had "23 stab wounds to the face and neck and nine stab

---

[10] *People v Gomez*, 295 Mich App 411, 414; 820 NW2d 217 (2012).

[11] Carp and Gorecki have the same mother, Margie Carp.

wounds to the torso" along with "incised wounds to the victim's extremities" and "numerous blunt force injuries including lacerations and bruises to the skin and fractures of the skull and injuries to the brain." Neither Carp nor Gorecki returned to the victim's home to determine her status or secure any assistance for her. It was not until June 1, 2006, following the receipt of a telephone call from Gorecki that his mother and a friend went to the victim's home to investigate and contacted police when they encountered "bloody footprints."

At trial the prosecutor presented evidence regarding statements by Carp to friends after the murder, indicating that he had thrown a mug at the victim and that Gorecki subsequently stabbed her. Although Carp admitted to another individual that he threw a mug at the victim, he denied knowing whether it made contact because his eyes were closed. To another friend, Carp stated that he struck the victim in the back of the head with a mug he had removed from the freezer and that, at the direction of Gorecki, he closed the blinds and windows. Carp also said that he "held the victim down while [Gorecki] kneed her face" and that Gorecki asked him for a knife, which Carp handed to him. Purportedly, Carp indicated that the victim was a "horrible person and deserved to die."

Carp's statements to police varied. While acknowledging the argument between the victim and Gorecki, Carp asserted that both were intoxicated and that Gorecki began to strike the victim and grabbed a knife from a kitchen drawer. Carp denied seeing Gorecki stab the victim or assisting in trying to clean up the blood. In a later interview, Carp denied striking the victim and indicated that he was unable to assist Gorecki in the clean up because he became ill. During his third inter-

view with police, Carp admitted he struck the victim with a heavy glass because Gorecki "was wrestling on the kitchen floor with the victim and stated to him, '[h]elp me, man. Help me, help me . . . . What do you want me to do. Bust, bust her in the head.' " Carp further admitted to closing the drapes and shutting the windows and that he assisted in taking the electronic equipment, placing the items in the victim's truck. At trial, Carp asserted duress as his primary defense.

As already stated, the jury convicted Carp of first-degree murder, armed robbery, larceny in a building, and larceny of property worth $1,000 or more but less than $20,000. The trial court sentenced Carp on November 20, 2006. A presentence investigation report was prepared and made available to the trial court. When queried by the trial court, the prosecutor stated the following as factors to be considered in sentencing, relevant to the circumstances of this case:

> [T]his is a situation where the Court has heard the testimony in this case and you, I believe, have the best understanding, objective and rational understanding of exactly what happened here and this Defendant's role in it. I think as it's been demonstrated in the PSI [presentence investigation report], in the Defendant's comments and his statements to the investigating officer in this case, he has never in any way, shape or form accepted responsibility for his role in what happened to this victim. He has never in any way, shape or form acknowledged that had it not been for his assistance to his brother, [the victim] may be alive today. And I find that to be extremely unfortunate, and it's unfortunate because the Defendant does not accept his role and does not indicate to the Court that he understands his part in what happened.
>
> This Court knows exactly how violent and how brutal this murder was and obviously the statutes in place dictate what the sentence must be in this case, but irrespective of

that I believe that the recommendation is appropriate on all accounts and I would ask the Court to follow it.

Citing caselaw and statutes pertaining to disposition hearings for juveniles,[12] defense counsel at sentencing began to discuss factors for a "designated waiver case," suggesting that the court was authorized to impose "either juvenile disposition . . . an adult sentence . . . or blended sentence." Defense counsel asserted that sentencing Carp to life imprisonment without parole was inherently unjust in light of his level of participation and lesser culpability in commission of the crime. At this point, the prosecutor and the trial court clarified that the factors were not applicable because this was an "automatic waiver case."

Seemingly in anticipation of the *Miller* Court's decision, defense counsel continued. While recognizing that Carp had some culpability in the crime, which demanded public punishment counsel asserted:

> [B]ut when the public punishment is one of mandatory life without the possibility of parole for a 15-year-old that presents himself to this Court with absolutely no prior record whatsoever and without at least in my opinion, a direct and intentional culpability or responsibility in the commission of this crime, I think [it] is inherently unjust, I think it's inherently unfair, and at the very least completely inappropriate with respect to individual, individualizing a sentencing that's appropriate to this Defendant.

In sentencing Carp to life without parole, the trial court commented:

> This is probably the most horrific case that I've been involved with in my entire career, the brutality of this act that was committed on the victim, my recollection is that even to the extent that the testimony of the doctor indicated there was actually no blood left in her body.

---

[12] *People v Petty*, 469 Mich 108, 113-118; 665 NW2d 443 (2003); MCL 712A.18.

The Court can't help but note that there were several opportunities that this Defendant had to, to escape, leave, get away, assist her in some way, and I — there's just — I can't find an explanation that I — for the fact that he didn't do that, from the testimony, the evidence that I heard during the course of this trial. There's nothing that I can muster or conjure up to explain to me why he didn't do that. I know there's strong discussion that he was under the influence of his stepbrother who was a bad actor to say the least, but this 15-year-old and then now 16-year-old, certainly had the sufficient faculties that he — there's no reason why he couldn't understand what was going on and what he, what he could have or should have done, and the unfortunate conclusion is that the victim is dead, and I believe that under the circumstances the, the conviction is proper, it's within the law, and is then for the Court obligated to follow the law.

### III. THE PAST AS PROLOGUE

#### A. INTRODUCTION

The importance of the past in shaping the present is recognized in William Shakespeare's *The Tempest*, when Antonio states, "Whereof what's past is prologue, what to come/ In yours and my discharge."[13] Although the *Miller* decision is the premise for our reconsideration of Carp's sentencing, it useful for this Court and trial courts that may implement this opinion to obtain an understanding of the historical context of United States Supreme Court rulings regarding Eighth Amendment jurisprudence that culminated in *Miller*.

As discussed by the Supreme Court in *Graham v Florida*, the Eighth Amendment provides:

"Excessive bail shall not be required, nor excessive fines imposed, *nor* cruel and *unusual punishments inflicted*." To

---

[13] Shakespeare, *The Tempest*, act II, sc 1.

determine whether a punishment is cruel and unusual, courts must look beyond historical conceptions to " 'the evolving standards of decency that mark the progress of a maturing society.' " "This is because '[t]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change.' "

The Cruel and Unusual Punishments Clause prohibits the imposition of inherently barbaric punishments under all circumstances. "[P]unishments of torture," for example, "are forbidden." These cases underscore the essential principle that, under the Eighth Amendment, the State must respect the human attributes even of those who have committed serious crimes.

For the most part, however, the Court's precedents consider punishments challenged not as inherently barbaric but as disproportionate to the crime. The concept of proportionality is central to the Eighth Amendment. Embodied in the Constitution's ban on cruel and unusual punishments is the "precept of justice that punishment for crime should be graduated and proportioned to [the] offense."[14]

### B. *RUMMEL v ESTELLE*: MANDATORY LIFE SENTENCES FOR ADULTS

In *Rummel v Estelle*,[15] the United States Supreme Court rejected an adult defendant's contention that his mandatory life sentence constituted cruel and unusual punishment under the Eighth Amendment. Five justices upheld the defendant's mandatory life sentence in accordance with Texas law, which required a life sentence under a recidivist sentencing statute for second and third felony convictions. The Texas trial court sentenced the defendant premised

---

[14] *Graham v Florida*, 560 US ___; 130 S Ct 2011, 2021; 176 L Ed 2d 825 (2010) (citations omitted; emphasis added).

[15] *Rummel v Estelle*, 445 US 263; 100 S Ct 1133; 63 L Ed 2d 382 (1980).

on his third conviction for felonies involving the fraudulent use of a credit card, forgery, and felony theft. The majority of justices of the United States Supreme Court specifically recognized the authority of the Texas legislature to impose sentences of increasing length on repeat offenders and the state's interest "in dealing in a harsher manner with those who by repeated criminal acts have shown that they are simply incapable of conforming to the norms of society as established by its criminal law."[16]

But the Court did not find a constitutional violation despite the fact that all three of the defendant's convictions arose from nonviolent property offenses. The Court also emphasized evidence that defendants sentenced to life under the recidivist statutory scheme typically were eligible for parole in as early as 12 years. While alluding to and discussing earlier cases that reviewed punishments as "grossly disproportionate" to the charged offenses as demonstrating an Eighth Amendment violation, the Court did not adopt such a test or definition.[17] Recognizing a "proportionality principle,"[18] the Court concluded that the primary inquiry should comprise objective criteria in order to avoid judgments premised on "subjective views" or varying standards of individual judges.[19] The Court deemed unpersuasive the comparisons by the defendant to other states' recidivist statutes.[20]

In his dissent, Justice Powell opined that Rummel's sentence was grossly disproportionate and that the possibility of parole was too speculative, rendering the

---

[16] *Id.* at 276.

[17] *Id.* at 271-272.

[18] *Id.* at 274 n 11.

[19] *Id.* at 275-276.

[20] *Id.* at 279-280.

defendant's sentence a violation of the Eighth Amendment prohibition against cruel and unusual punishment. Citing the historical recognition and use of proportionality in the review of punishments, Justice Powell identified three factors for consideration: (a) the nature of the particular offense, including factual circumstances specific to the offender and his or her criminal history, (b) the comparable sentencing schemes effectuated in other jurisdictions, and (c) the punishments imposed by the state for other offenses.[21]

### C. *SOLEM v HELM*: PROPORTIONALITY IN SENTENCING

Notably, Justice Powell three years later wrote the majority opinion in *Solem v Helm*,[22] which again dealt with a sentence imposed under a recidivist statute. The defendant, Helm, engaged in six nonviolent felonies over a period of 15 years, which subjected him to life in prison without parole. In determining that the Eighth Amendment required proportionality between the offense and the punishment imposed, the majority held that although a reviewing court must give "substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments," the Eighth Amendment necessitates that "a criminal sentence . . . be proportionate to the crime for which the defendant has been convicted" and that "no penalty is *per se* constitutional."[23] In determining the constitutionality of a sentence, the Court identified the following factors to be considered: (a) "the gravity of the offense and the harshness of the penalty," (b) the sentences typically imposed in other jurisdic-

---

[21] *Id.* at 295-306.

[22] *Solem v Helm*, 463 US 277; 103 S Ct 3001; 77 L Ed 2d 637 (1983).

[23] *Id.* at 290.

tions for the same crime, and (c) the sentences imposed within the same jurisdiction for different offenses.[24]

The Court further indicated that the personal characteristics and history of the defendant and his offenses should also be considered.[25] Consequently, the Court found that the defendant's conviction violated the Eighth Amendment. Chief Justice Burger's dissent took issue with the failure to follow *Rummel*'s rejection of a proportionality review except in extreme and rare instances in nonfelony cases.[26]

### D. *HARMELIN v MICHIGAN*: EXCLUSION OF MITIGATING FACTORS FOR SERIOUS CRIMES

Eight years later, and closer to home, the Court found a Michigan statute imposing a life sentence without the possibility of parole for the possession of more than 650 grams of cocaine did not offend the Eighth Amendment.[27] Notably, the defendant had no previous felony convictions. The only area of specific concurrence among the justices was that when dealing with a serious crime, the state could impose a severe punishment that excluded consideration of "mitigating factors" pertaining to a particular defendant without violating the Eighth Amendment. The Court noted, "We have drawn the line of required individualized sentencing at capital cases, and see no basis for extending it further."[28] In contrast, the dissent emphasized a principle of proportionality in conjunction with the Eighth Amendment and endorsed the factors the *Solem* Court previously

[24] *Id.* at 292.

[25] *Id.* at 296-297 n 22, 303 n 32.

[26] *Id.* at 305-318 (Burger, C.J., dissenting).

[27] *Harmelin v Michigan*, 501 US 957, 994-996; 111 S Ct 2680; 115 L Ed 2d 836 (1991).

[28] *Id.* at 996.

elucidated. Subsequent cases dealing with recidivist statutes again rejected a proportionality review.[29]

E. *ROPER v SIMMONS*: PROHIBITION OF THE DEATH PENALTY FOR JUVENILES

Beginning in 2005, the United States Supreme Court issued a series of decisions pertaining specifically to the Eighth Amendment and juveniles. In *Roper v Simmons*,[30] the Court determined that the Eighth Amendment precluded the imposition of the death penalty on juvenile offenders.[31] Noting a general public consensus against the imposition of such extreme punishment for juveniles, the Court went on to state:

> Because the death penalty is the most severe punishment, the Eighth Amendment applies to it with special force. Capital punishment must be limited to those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution. This principle is implemented throughout the capital sentencing process. States must give narrow and precise definition to the aggravating factors that can result in a capital sentence. In any capital case a defendant has wide latitude to raise as a mitigating factor any aspect of [his or her] character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. There are a number of crimes that beyond question are severe in absolute terms, yet the death penalty may not be imposed for their commission. The death penalty may not be imposed on certain classes of offenders, such as juveniles

---

[29] See *Ewing v California*, 538 US 11, 22-24, 30-31; 123 S Ct 1179; 155 L Ed 2d 108 (2003), and *Lockyer v Andrade*, 538 US 63, 72-73; 123 S Ct 1166; 155 L Ed 2d 144 (2003).

[30] *Roper v Simmons*, 543 US 551, 568-575; 125 S Ct 1183; 161 L Ed 2d 1 (2005).

[31] The case specifically abrogated *Stanford v Kentucky*, 492 US 361; 109 S Ct 2969; 106 L Ed 2d 306 (1989).

under 16, the insane, and the mentally retarded, no matter how heinous the crime. These rules vindicate the underlying principle that the death penalty is reserved for a narrow category of crimes and offenders.[32]

The Court proceeded to recognize the differences between juvenile and adult offenders, referencing: (a) the " 'lack of maturity and an underdeveloped sense of responsibility,' " (b) the vulnerability and susceptibility of juveniles to "negative influences and outside pressures, including peer pressure," and (c) that "the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed."[33]

The Court went on to rule that "[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed."[34] Of note is the Court's recognition that the existence of the alternative penalty of life without parole assisted in justifying the decision to preclude use of the death penalty for specified juveniles, stating, "To the extent the juvenile death penalty might have residual deterrent effect, it is worth noting that the punishment of life imprisonment without the possibility of parole is itself a severe sanction, in particular for a young person."[35]

In her dissent, Justice O'Connor, while recognizing the legitimacy of proportionality concerns in the imposition of the death penalty, implied the existence of a procedural fail-safe precluding the necessity of categorical rules, stating:

---

[32] *Roper*, 543 US at 568-569 (quotation marks and citations omitted).

[33] *Id.* at 569-570 (citation omitted).

[34] *Id.* at 578.

[35] *Id.* at 572.

The proportionality issues raised by the Court clearly
implicate Eighth Amendment concerns. But these concerns
may properly be addressed not by means of an arbitrary,
categorical age-based rule, but rather through individual-
ized sentencing in which juries are required to give appro-
priate mitigating weight to the defendant's immaturity, his
susceptibility to outside pressures, his cognizance of the
consequences of his actions, and so forth. In that way the
constitutional response can be tailored to the specific
problem it is meant to remedy. The Eighth Amendment
guards against the execution of those who are "insuffi-
cient[ly] culpab[le]," in significant part, by requiring sen-
tencing that "reflect[s] a reasoned *moral* response to the
defendant's background, character, and crime." Accord-
ingly, the sentencer in a capital case must be permitted to
give full effect to all constitutionally relevant mitigating
evidence. A defendant's youth or immaturity is, of course,
a paradigmatic example of such evidence.[36]

Justice Scalia's dissent sought to distinguish between
juveniles engaged in "risky or antisocial behavior" from
those executing heinous, premeditated acts. Specifi-
cally:

Moreover, the cited studies describe only adolescents
who engage in risky or antisocial behavior, as many young
people do. Murder, however, is more than just risky or
antisocial behavior. It is entirely consistent to believe that
young people often act impetuously and lack judgment,
but, at the same time, to believe that those who commit
premeditated murder are—at least sometimes—just as
culpable as adults. Christopher Simmons, who was only
seven months shy of his 18th birthday when he murdered
Shirley Crook, described to his friends *beforehand*—"[i]n
chilling, callous terms," as the Court puts it—the murder
he planned to commit. He then broke into the home of an
innocent woman, bound her with duct tape and electrical
wire, and threw her off a bridge alive and conscious. In
their *amici* brief, the States of Alabama, Delaware, Okla-

---

[36] *Id.* at 602-603 (O'Connor, J., dissenting) (citations omitted).

homa, Texas, Utah, and Virginia offer additional examples
of murders committed by individuals under 18 that involve
truly monstrous acts. In Alabama, two 17-year-olds, one
16-year-old, and one 19-year-old picked up a female hitch-
hiker, threw bottles at her, and kicked and stomped her for
approximately 30 minutes until she died. They then sexu-
ally assaulted her lifeless body and, when they were fin-
ished, threw her body off a cliff. They later returned to the
crime scene to mutilate her corpse. Other examples in the
brief are equally shocking. Though these cases are assur-
edly the exception rather than the rule, the studies the
Court cites in no way justify a constitutional imperative
that prevents legislatures and juries from treating excep-
tional cases in an exceptional way—by determining that
some murders are not just the acts of happy-go-lucky
teenagers, but heinous crimes deserving of death.[37]

F. *GRAHAM v FLORIDA*: PROHIBITION OF LIFE SENTENCES
WITHOUT PAROLE FOR JUVENILES COMMITTING CRIMES
OTHER THAN HOMICIDE

In *Graham v Florida*,[38] the precursor to *Miller*, the
United States Supreme Court addressed the Eighth
Amendment and the imposition of punishment entail-
ing life in prison without parole for juveniles for crimes
other than homicide. The majority determined that the
Eighth Amendment precluded sentencing juveniles to
life in prison without parole for crimes less than homi-
cide. Noting concerns with proportionality and the
reasons for incarceration encompassing both retribu-
tion and rehabilitation, the Court primarily focused on
evidence in the behavioral and social sciences indicating
the differences in juvenile brain functioning and lack of
maturation. The Court found:

> Community consensus, while entitled to great weight, is
> not itself determinative of whether a punishment is cruel

---

[37] *Id.* at 618-619 (citations omitted).

[38] *Graham*, 560 US ___; 130 S Ct 2011.

and unusual. In accordance with the constitutional design, the task of interpreting the Eighth Amendment remains our responsibility. The judicial exercise of independent judgment requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question. In this inquiry the Court also considers whether the challenged sentencing practice serves legitimate penological goals.[39]

Citing the *Roper* Court's recognition of the "lessened culpability" of juveniles and lack of maturity, the Court noted, "A juvenile is not absolved of responsibility for his actions, but his transgression is not as morally reprehensible as that of an adult."[40] Further,

from a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. These matters relate to the status of the offenders in question; and it is relevant to consider next the nature of the offenses to which this harsh penalty might apply.[41]

The Court further distinguished and recognized the existence of "a line between homicide and other serious violent offenses against the individual."[42] As a consequence of this distinction, "when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability. The age of the offender and the nature of the crime each bear on the analysis."[43]

---

[39] *Id.* at ___; 130 S Ct at 2026 (citations and quotation marks omitted).

[40] *Id.* at ___; 130 S Ct at 2026.

[41] *Id.* at ___; 130 S Ct at 2026-2027 (citations and quotation marks omitted).

[42] *Id.* at ___; 130 S Ct at 2027 (citation and quotation marks omitted).

[43] *Id.* at ___; 130 S Ct at 2027.

In his dissent, Justice Thomas, joined in part by Justices Scalia and Alito, chastised the majority for its misuse of the historical evaluation of Eighth Amendment cases dealing with cruel and unusual punishment as being restricted to especially torturous methods of punishment rather than to the imposition of sentence and rejecting the concept of proportionality in regard to Eighth Amendment jurisprudence.[44] Foreshadowing concerns that this Court must address regarding the establishment of rules and procedures in addition to determining precisely where a line is to be drawn, the dissent took issue with the Court's raising more questions than it answered, asserting:

> Both the Court and the concurrence claim their decisions to be narrow ones, but both invite a host of line-drawing problems to which courts must seek answers beyond the strictures of the Constitution. The Court holds that "[a] State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime," but must provide the offender with "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." But what, exactly, does such a "meaningful" opportunity entail? When must it occur? And what Eighth Amendment principles will govern review by the parole boards the Court now demands that States empanel? The Court provides no answers to these questions, which will no doubt embroil the courts for years.[45]

#### IV. *MILLER v ALABAMA*

##### A. INTRODUCTION

This evolution in the Court's decisions has left us ripe for the determination in *Miller v Alabama* and its

---

[44] *Id.* at ___; 130 S Ct at 2044.

[45] *Id.* at ___; 130 S Ct at 2057 (citations omitted).

companion case of *Jackson v Hobbs*, both involving 14-year-old offenders convicted of murder and sentenced to mandatory life in prison without the possibility of parole.[46] The Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eight Amendment's prohibition on 'cruel and unusual punishments.' "[47] With this ruling, the *Miller* Court in part sought to resolve the ongoing dispute regarding the role and necessity of considering proportionality in sentencing.

### B. THE FACTS IN *JACKSON*

Jackson, accompanied by two other minor boys, decided to rob a video store. While en route to the store, Jackson discovered that one of the boys was armed with a sawed-off shotgun. Jackson initially remained outside the store but entered while one of his cohorts was confronting the store clerk, demanding money and pointing the weapon. Jackson's cohort shot and killed the clerk following her assertion she would call the police. Arkansas prosecutors have discretion whether to charge a 14-year-old as an adult in conjunction with certain delineated offenses. The prosecutor charged Jackson with felony murder and aggravated robbery as an adult. Jackson sought to transfer his case to a juvenile court, but based on the factual circumstances, a psychiatric evaluation, and his prior juvenile history, the Arkansas trial court denied his request. The jury convicted Jackson of both crimes, and the Arkansas trial court sentenced him to life in prison without parole.[48]

---

[46] *Miller*, 567 US at ___; 132 S Ct at 2460.

[47] *Id.* at ___; 132 S Ct at 2460.

[48] *Id.* at ___; 132 S Ct at 2461.

## C. THE FACTS IN *MILLER*

Similarly, Miller was 14 years of age at the time he committed his crime. Miller had a history of foster-care placement premised on his mother's alcoholism and drug addiction. Evidence also indicated that his stepfather abused Miller. Miller had a history of drug and alcohol use and a series of attempted suicides. Miller and a friend were at his home when a neighbor arrived to effectuate a drug deal with Miller's mother. Miller and his cohort followed the neighbor when he returned home, and all three "smoked marijuana and played drinking games." When the neighbor passed out, Miller stole his wallet. When Miller tried to replace the wallet, the victim grabbed Miller by the throat. Miller's friend struck the victim with a baseball bat. Despite being released from the victim's grip, Miller grabbed the bat and continued to strike the victim with multiple blows to the head. Miller and his friend left but returned to the crime scene and started two fires to destroy evidence of the crime. The victim died of his injuries and smoke inhalation. While Alabama law required the prosecutor to initially charge Miller as a juvenile, the prosecutor was also permitted to remove the case to adult court. The prosecutor charged Miller as an adult with murder in the course of an arson, which carried a mandatory life sentence without parole.[49]

## D. THE MAJORITY OPINION IN *MILLER*

In discussing Eighth Amendment jurisprudence, the *Miller* Court majority, with Justice Kagan authoring the opinion, noted that it had recently, in *Graham*, addressed the "concept of proportionality" as "central

---

[49] *Id.* at ___; 132 S Ct at 2462-2463.

to the Eighth Amendment."[50] The *Miller* majority further indicated that it "view[ed] that concept less through a historical prism than according to the evolving standards of decency that mark the progress of a maturing society."[51] The *Miller* majority reviewed "two strands of precedent reflecting our concern with proportionate punishment." The first strand "has adopted categorical bans on mismatches between the culpability of a class of offenders and the severity of a penalty."[52] The second strand "prohibited mandatory imposition of capital punishment, requiring that sentencing authorities consider the characteristics of a defendant and the details of his offense before sentencing him to death."[53] The *Miller* majority found "the confluence of these two lines of precedent leads to the conclusion that mandatory life-without-parole sentences for juveniles violate the Eighth Amendment."[54]

The *Miller* majority reviewed decisions recognizing the inherent differences between juvenile and adult offenders and how these characteristics affect both the justification for and the appropriateness of imposing a life sentence without parole on a juvenile, finding, "An offender's age . . . is relevant to the Eighth Amendment, and so criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed."[55] The *Miller* majority found the imposition of a mandatory sentence to be particularly subject to criticism. Specifically:

---

[50] *Id.* at ___; 132 S Ct at 2463 (citation and quotation marks omitted).

[51] *Id.* at ___; 132 S Ct at 2463 (citations and quotation marks omitted).

[52] *Id.* at ___; 132 S Ct at 2463.

[53] *Id.* at ___; 132 S Ct at 2463-2464.

[54] *Id.* at ___; 132 S Ct at 2464.

[55] *Id.* at ___; 132 S Ct at 2466 (citation and quotation marks omitted).

But the mandatory penalty schemes at issue here pre-
vent the sentencer from taking account of these central
considerations. By removing youth from the balance—by
subjecting a juvenile to the same life-without-parole sen-
tence applicable to an adult—these laws prohibit a sentenc-
ing authority from assessing whether the law's harshest
term of imprisonment proportionately punishes a juvenile
offender. That contravenes *Graham's* (and also *Roper's*)
foundational principle: that imposition of a State's most
severe penalties on juvenile offenders cannot proceed as
though they were not children.[56]

Highlighting the "special pertinence" of its earlier
rulings, the *Miller* majority reaffirmed "that a sen-
tencer [must] have the ability to consider the mitigating
qualities of youth."[57] Emphasizing that "youth is more
than a chronological fact," the *Miller* majority noted
that this period of life comprised a time "when a person
may be most susceptible to influence and to psychologi-
cal damage," with "signature qualities" of a "transient"
nature.[58] The *Miller* majority explained the flaw inher-
ent in imposing a mandatory sentence of life in prison
without parole on a juvenile, stating:

Such mandatory penalties, by their nature, preclude a
sentencer from taking account of an offender's age and the
wealth of characteristics and circumstances attendant to it.
Under these schemes, every juvenile will receive the same
sentence as every other—the 17-year-old and the 14-year-old,
the shooter and the accomplice, the child from a stable
household and the child from a chaotic and abusive one. And
still worse, each juvenile (including these two 14-year-olds)
will receive the same sentence as the vast majority of adults
committing similar homicide offenses—but really, as *Graham*
noted, a *greater* sentence than those adults will serve. In
meting out the death penalty, the elision of all these differ-

---

[56] *Id.* at ___; 132 S Ct at 2466.

[57] *Id.* at ___; 132 S Ct at 2467 (citation and quotation marks omitted).

[58] *Id.* at ___; 132 S Ct at 2467 (citation and quotation marks omitted).

ences would be strictly forbidden. And once again, *Graham* indicates that a similar rule should apply when a juvenile confronts a sentence of life (and death) in prison.[59]

The *Miller* majority proceeded to delineate the requirements for consideration when sentencing a juvenile for a homicide:

> [I]n imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult. To recap: Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.[60]

The *Miller* majority concluded "that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders. By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment."[61] The *Miller* majority

---

[59] *Id.* at ___; 132 S Ct at 2467-2468.

[60] *Id.* at ___; 132 S Ct at 2468 (citations omitted).

[61] *Id.* at ___; 132 S Ct at 2469 (citations omitted).

did reject, however, arguments for a categorical bar to sentencing juveniles to life in prison without parole, stating, "[W]e do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison."[62] The *Miller* majority emphasized that its decision served to

> mandate[] only that a sentence follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty. And in so requiring, our decision flows straightforwardly from our precedents: specifically, the principle of *Roper*, *Graham*, and our individualized sentencing cases that youth matters for purposes of meting out the law's most serious punishments. When both of those circumstances have obtained in the past, we have not scrutinized or relied in the same way on legislative enactments."[63]

Addressing the statutory sentencing schemes in various states, the *Miller* Court noted:

> Almost all jurisdictions allow some juveniles to be tried in adult court for some kinds of homicide. But most States do not have separate penalty provisions for those juvenile offenders. Of the 29 jurisdictions mandating life without parole for children, more than half do so by virtue of generally applicable penalty provisions, imposing the sentence without regard to age. And indeed, some of those States set no minimum age for who may be transferred to adult court in the first instance, thus applying life-without-parole mandates to children of any age—be it 17 or 14 or 10 or 6. . . . [W]e think that underscores that the statutory eligibility of a juvenile offender for life without parole does not indicate that the penalty has been endorsed through deliberate, express, and full legislative consideration.[64]

---

[62] *Id.* at ___; 132 S Ct at 2469.

[63] *Id.* at ___; 132 S Ct at 2471.

[64] *Id.* at ___; 132 S Ct at 2473 (citations and quotation marks omitted).

Notably, the *Miller* majority found the existence of transfer statutes effectuated in some states insufficient to rectify the identified procedural problem. It recognized that "[o]f the 29 relevant jurisdictions, about half place at least some juvenile homicide offenders in adult court automatically, with no apparent opportunity to seek transfer to juvenile court."[65] According to the *Miller* majority, "Even when States give transfer-stage discretion to judges, it has limited utility" because of the absence of significant information available at that stage of the proceedings regarding the offender and the circumstances of the crime. Recognizing that "the question at transfer hearings may differ dramatically from the issue at a post-trial sentencing," the *Miller* majority noted that "transfer decisions often present a choice between extremes: light punishment as a child or standard sentencing as an adult."[66] The *Miller* majority went on to suggest that "[d]iscretionary sentencing in adult court would provide different options: There, a judge or jury could choose, rather than a life-without-parole sentence, a lifetime prison term *with* the possibility of parole or a lengthy term of years."[67]

In sum, *Miller* requires:

> [A] judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles. By requiring that all children convicted of homicide receive lifetime incarceration without possibility of parole, regardless of their age and age-related characteristics and the nature of their crimes, the mandatory sentencing schemes before us violate this principle of proportionality, and so the Eight Amendment's ban on cruel and unusual punishment.[68]

---

[65] *Id.* at ___; 132 S Ct at 2474.

[66] *Id.* at ___; 132 S Ct at 2474.

[67] *Id.* at ___; 132 S Ct at 2474-2475.

[68] *Id.* at ___; 132 S Ct at 2475.

### E. THE *MILLER* CONCURRENCE

In his concurrence Justice Breyer, joined by Justice Sotomayor, suggested that a distinction at sentencing must inherently be drawn, similar to that used in capital cases, between those juveniles who killed and those involved in homicides but did not kill or lacked an intent to kill for the imposition of life sentences without parole. In other words, according to Justice Breyer, "the kinds of homicide that can subject a juvenile offender to life without parole must exclude instances where the juvenile himself neither kills nor intends to kill the victim."[69]

### F. THE *MILLER* DISSENTS

The dissent authored by Chief Justice Roberts and joined by Justices Scalia, Thomas, and Alito chastised the *Miller* majority for trying to answer "grave and challenging questions of morality and social policy" rather than "apply[ing] the law."[70] Asserting the existence of dissonance between the Court's use of the Eight Amendment "to ban a punishment that the Court does not itself characterize as unusual," Chief Justice Robert's dissent noted the inherent inconsistency of the majority's reasoning, stating:

> Put simply, if a 17-year-old is convicted of deliberately murdering an innocent victim, it is not "unusual" for the murderer to receive a mandatory sentence of life without parole. That reality should preclude finding that mandatory life imprisonment for juvenile killers violates the Eighth Amendment.[71]

Taking issue with the subjective nature of the major-

---

[69] *Id.* at ___; 132 S Ct at 2475-2476 (Breyer, J., concurring).

[70] *Id.* at ___; 132 S Ct at 2477 (Roberts, C.J., dissenting).

[71] *Id.* at ___; 132 S Ct at 2477.

ity's reasoning, the *Miller* dissent further argued that the current national consensus supports the practice of sentencing juveniles convicted of homicide offenses to mandatory life without parole as demonstrated by the number of jurisdictions that have enacted such legislation. The *Miller* dissent criticized the majority for ignoring this "objective indicia of society's standards" and instead, imposing "our own subjective values or beliefs."[72] Chief Justice Roberts's dissent expressed further concern regarding the overreaching nature and future implications of the majority's decision, stating, "Today's holding may be limited to mandatory sentences, but the Court has already announced that discretionary life without parole for juveniles should be 'uncommon'—or, to use a common synonym, 'unusual.' "[73] The dissent opined:

> This process has no discernible end point—or at least none consistent with our Nation's legal traditions. *Roper* and *Graham* attempted to limit their reasoning to the circumstances they addressed—*Roper* to the death penalty, and *Graham* to nonhomicide crimes. Having cast aside those limits, the Court cannot now offer a credible substitute, and does not even try. After all, the Court tells us, "none of what [*Graham*] said about children . . . is crime-specific." The principle behind today's decision seems to be only that because juveniles are different from adults, they must be sentenced differently. There is no clear reason that principle would not bar all mandatory sentences for juveniles, or any juvenile sentence as harsh as what a similarly situated adult would receive. Unless confined, the only stopping point for the Court's analysis would be never permitting juvenile offenders to be tried as adults. Learning that an Amendment that bars only "unusual" punish-

---

[72] *Id.* at ___; 132 S Ct at 2477-2479 (citations and quotation marks omitted).

[73] *Id.* at ___; 132 S Ct at 2481.

ments requires the abolition of this uniformly established practice would be startling indeed.[74]

In his dissent, Justice Alito also focused on a somewhat arbitrary age distinction between offenders, asserting:

> The category of murderers that the Court delicately calls "children" (murderers under the age of 18) consists overwhelmingly of young men who are fast approaching the legal age of adulthood. . . .
>
> Seventeen-year-olds commit a significant number of murders every year, and some of these crimes are incredibly brutal. Many of these murderers are at least as mature as the average 18-year-old.[75]

Emphasizing the sensibility of having sentencing policy remain exclusively in the realm of legislative action, Justice Alito opined:

> The Eighth Amendment imposes certain limits on the sentences that may be imposed in criminal cases, but for the most part it leaves questions of sentencing policy to be determined by Congress and the state legislatures—and with good reason. Determining the length of imprisonment that is appropriate for a particular offense and a particular offender inevitably involves a balancing of interests. If imprisonment does nothing else, it removes the criminal from the general population and prevents him from committing additional crimes in the outside world. When a legislature prescribes that a category of killers must be sentenced to life imprisonment, the legislature, which presumably reflects the views of the electorate, is taking the position that the risk that these offenders will kill again outweighs any countervailing consideration, including reduced culpability due to immaturity or the possibility of rehabilitation. When the majority of this Court countermands that democratic decision, what the majority is

---

[74] *Id.* at ___; 132 S Ct at 2481-2482 (citations omitted).

[75] *Id.* at ___; 132 S Ct at 2489 (Alito, J., dissenting).

saying is that members of society must be exposed to the risk that these convicted murderers, if released from custody, will murder again.

Unless our cases change course, we will continue to march toward some vision of evolutionary culmination that the Court has not yet disclosed. The Constitution does not authorize us to take the country on this journey.[76]

While the *Miller* dissents do not provide direct guidance for resolving the issues that *Miller* creates, the dissents do serve to highlight and emphasize concerns regarding the full implication of the *Miller* decision on Michigan's juvenile sentencing scheme.

### V. RETROACTIVITY

#### A. INTRODUCTION

A significant, and to Carp a dispositive, threshold matter to be confronted by this Court is whether *Miller* is to be given retroactive application.[77] Historically, whether to apply a decision retroactively is premised on the status of the case being on direct rather than collateral review. Direct review involves the exhaustion of state appellate proceedings, which culminates in a judgment of conviction being finalized. In accordance with federal law, a challenged state judgment is ren-

---

[76] *Id.* at ___; 132 S Ct at 2490.

[77] We note that none of the parties dispute that Carp's appeal to this Court is on collateral review and was brought pursuant to MCR 6.500 *et seq.* Carp's conviction "became final when [his] time for a direct appeal expired." See *Gomez,* 295 Mich App at 414, citing *Beard v Banks,* 542 US 406, 411; 124 S Ct 2504; 159 L Ed 2d 494 (2004) (standing for the proposition that convictions are final when the availability of direct appeal is exhausted and the time for seeking a writ of certiorari has also expired). Because Carp's conviction is final, he "is entitled to relief only if a retroactive change in the law has altered the validity of his . . . conviction." *Gomez,* 295 Mich App at 414-415, citing MCR 6.500 *et seq.*

dered final upon the "conclusion of direct review or the expiration of the time for seeking such review."[78] Discussing the concept of finality in the context of direct review, the United States Supreme Court has explained:

> The text of [18 USC] 2244(d)(1)(A), which marks finality as of "the conclusion of direct review or the expiration of the time for seeking such review," consists of two prongs. Each prong—the "conclusion of direct review" and the "expiration of the time for seeking such review"—relates to a distinct category of petitioners. For petitioners who pursue direct review all the way to this Court, the judgment becomes final at the "conclusion of direct review"—when this Court affirms a conviction on the merits or denies a petition for certiorari. For all other petitioners, the judgment becomes final at the "expiration of the time for seeking such review"—when the time for pursuing direct review in this Court, or in state court, expires.[79]

In contrast, the United States Supreme Court has defined " '[c]ollateral review' " . . . "by considering the ordinary understanding of the phrase."[80] Turning to dictionary definitions, the Court stated:

> The term "collateral," in its "customary and preferred sense," means "[l]ying aside from the main subject, line of action, issue, purpose, etc.; . . . subordinate, indirect[.]" By definition, something that is "collateral" is "indirect," not direct. This suggests that "collateral" review is review that is "[l]ying aside from the main" review, i.e., that is not part of direct review.

\* \* \*

---

[78] 28 USC 2244(d)(1)(A).

[79] *Gonzalez v Thaler*, 565 US ___, ___; 132 S Ct 641, 653-654; 181 L Ed 2d 619 (2012).

[80] *Wall v Kholi*, 562 US ___, ___; 131 S Ct 1278, 1284; 179 L Ed 2d 252 (2011).

Our prior usage of the term "collateral" also supports
this understanding. We have previously described a
variety of proceedings as "collateral," and all of these
proceedings share the characteristic that we have iden-
tified, *i.e.*, they stand apart from the process of direct
review.[81]

Concomitant with a consideration of whether a
case is on direct versus collateral review is the
additional consideration of whether any new rule
announced in the decision is substantive or proce-
dural in nature.[82] While one would assume that such
distinctions are simple to discern and apply, the Court
has recognized that its decisions pertaining to "retro-
activity" rendered "between 1965 and 1987" have been
particularly "confusing."[83] The Court specifically
stated:

[W]e note at the outset that the very word "retroac-
tivity" is misleading because it speaks in temporal terms.
"Retroactivity" suggests that when we declare that a new
constitutional rule of criminal procedure is "nonretroac-
tive," we are implying that the right at issue was not in
existence prior to the date the "new rule" was an-
nounced. But this is incorrect. As we have already
explained, the source of a "new rule" is the Constitution
itself, not any judicial power to create new rules of law.
Accordingly, the underlying right necessarily pre-exists
our articulation of the new rule. What we are actually
determining when we assess the "retroactivity" of a new
rule is not the temporal scope of a newly announced
right, but whether a violation of the right that occurred

---

[81] *Id.* at ___; 131 S Ct at 1284 (citations omitted).

[82] See *Whorton v Bockting*, 549 US 406, 416; 127 S Ct 1173; 167 L Ed 2d
1 (2007); *Teague v Lane*, 489 US 288, 305, 310; 109 S Ct 1060; 103 L Ed 2d
334 (1989); *Griffith v Kentucky*, 479 US 314, 322-323; 107 S Ct 708; 93 L Ed
2d 649 (1987).

[83] *Danforth v Minnesota*, 552 US 264, 271; 128 S Ct 1029; 169 L Ed 2d
859 (2008).

prior to the announcement of the new rule will entitle a criminal defendant to the relief sought.[84]

## B. THE *LINKLETTER* RULE: PROSPECTIVE APPLICATION ONLY

The first time the United States Supreme Court expressly considered the issue of retroactivity was in *Linkletter v Walker*.[85] There, the Court sought to determine whether the courts should apply the *Mapp v Ohio*[86] exclusionary rule retroactively to cases on collateral review. "The Court determined that the retroactivity of *Mapp* should be determined by examining the purpose of the exclusionary rule, the reliance of the States on prior law, and the effect on the administration of justice of a retroactive application of the exclusionary rule."[87] Ultimately, using this standard the *Linkletter* Court determined that the courts should apply the exclusionary rule only prospectively.[88]

Later, in a separate opinion in *Mackey v United States*,[89] Justice Harlan asserted his belief that new rules should not, in general, be applied retroactively to cases on collateral review. He

> identified only two exceptions to his general rule of non-retroactivity . . . . First, a new rule should be applied retroactively if it places "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." Second, a new rule should

---

[84] *Id.*

[85] *Linkletter v Walker*, 381 US 618; 85 S Ct 1731; 14 L Ed 2d 601 (1965), abrogated in part by *Davis v United States*, 564 US ___; 131 S Ct 2419 (2011).

[86] *Mapp v Ohio*, 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961).

[87] *Teague*, 489 US at 302.

[88] *Id.*

[89] *Mackey v United States*, 401 US 667; 91 S Ct 1160; 28 L Ed 2d 404 (1971) (Harlan, J., concurring in part and dissenting in part).

be applied retroactively if it requires the observance of "those procedures that ... are 'implicit in the concept of ordered liberty.' "[90]

### C. *GRIFFITH*: REJECTION OF THE *LINKLETTER* PROSPECTIVE-ONLY RULE

Because of difficulties in the application and the lack of consistency resulting from use of the *Linkletter* rule, the Court subsequently rejected the rule in *Griffith*.[91] The Court

> rejected as unprincipled and inequitable the *Linkletter* standard for cases pending on direct review at the time a new rule is announced, and adopted the first part of the retroactivity approach advocated by Justice Harlan. We agreed with Justice Harlan that "failure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication." We gave two reasons for our decision. First, because we can only promulgate new rules in specific cases and cannot possibly decide all cases in which review is sought, "the integrity of judicial review" requires the application of the new rule to "all similar cases pending on direct review." ...
>
> Second, because "selective application of new rules violates the principle of treating similarly situated defendants the same," we refused to continue to tolerate the inequity that resulted from not applying new rules retroactively to defendants whose cases had not yet become final."[92]

The *Griffith* Court definitively stated, "[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on

---

[90] *Teague*, 489 US at 307, quoting *Mackey*, 401 US at 692-693 (Harlan, J., concurring in part and dissenting in part) (citation omitted).

[91] *Griffith*, 479 US at 328.

[92] *Teague*, 489 US at 304 (citations omitted).

direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past."[93]

### D. *TEAGUE*: ADOPTION OF THE HARLAN APPROACH AND ITS EXCEPTIONS

In *Teague*, the Court "adopt[ed] Justice Harlan's view of retroactivity for cases on collateral review," stating, "Unless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced."[94] The *Teague* Court expanded on and modified Justice Harlan's second exception "that a new rule should be applied retroactively if it requires the observance of 'those procedures that . . . are "implicit in the concept of ordered liberty" ' " to mean that "the second exception . . . be reserved for watershed rules of criminal procedure," explaining:

> "Typically, it should be the case that any conviction free from federal constitutional error at the time it became final, will be found, upon reflection, to have been fundamentally fair and conducted under those procedures essential to the substance of a full hearing. However, in some situations it might be that time and growth in social capacity, as well as judicial perceptions of what we can rightly demand of the adjudicatory process, will properly alter our understanding of the *bedrock procedural elements* that must be found to vitiate the fairness of a particular conviction. For example, such, in my view, is the case with the right to counsel at trial now held a necessary condition precedent to any conviction for a serious crime."[95]

---

[93] *Griffith*, 479 US at 328.

[94] *Teague*, 489 US at 310.

[95] *Id.* at 311-312, quoting *Mackey*, 401 US at 693-694.

The Court indicated a continuing concern with inequitable treatment and opined, "We can simply refuse to announce a new rule in a given case unless the rule would be applied retroactively to the defendant in the case and to all others similarly situated."[96] Consequently, the Court held

> that, implicit in the retroactivity approach we adopt today, is the principle that habeas corpus cannot be used as a vehicle to create new constitutional rules of criminal procedure unless those rules would be applied retroactively to *all* defendants on collateral review through one of the two exceptions we have articulated.[97]

Years later in *Whorton v Bockting*, the Court reaffirmed its holding in *Teague*, stating, "Under the *Teague* framework, an old rule applies both on direct and collateral review, but a new rule is generally applicable only to cases that are still on direct review."[98] Exceptions exist, and "[a] new rule applies retroactively in a collateral proceeding only if (1) the rule is substantive or (2) the rule is a 'watershed rul[e] of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding."[99] The Court defined a "new rule" as " 'a rule that . . . was not *dictated* by precedent existing at the time the defendant's conviction became final." ' "[100] The Court also noted that the exception pertaining to watershed rules is both "extremely narrow" and "unlikely."[101] To qualify as a

---

[96] *Teague*, 489 US at 316.

[97] *Id.*

[98] *Whorton*, 549 US at 416.

[99] *Id.* (citations omitted) (alteration in original).

[100] *Id.* (citations omitted) (alteration in original).

[101] *Id.* at 417. The Court further indicated in *Whorton*, 549 US at 419, that the only case having met this criteria was *Gideon v Wainwright*, 372 US 335; 83 S Ct 792; 9 L Ed 2d 799 (1963).

"watershed rule" the Court asserted that "a new rule must meet two requirements. First, the rule must be necessary to prevent an impermissibly large risk of an inaccurate conviction. Second, the rule must alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding."[102]

### E. APPLYING THE UNITED STATES SUPREME COURT'S RETROACTIVITY STANDARDS

#### 1. *MILLER* ENUNCIATES A "NEW RULE"

Applying these standards, it is uncontested that *Miller* falls within the definition of a "new rule" because it "was not *dictated* by precedent existing at the time the defendant's conviction became final."[103] "[T]here can be no dispute that a decision announces a new rule if it expressly overrules a prior decision . . . ."[104] While not contested, the characterization of the *Miller* decision as comprising a new rule is of importance because

> [w]hen a decision of this Court results in a "new rule," that rule applies to all criminal cases still pending on direct review. As to convictions that are already final, however, the rule applies only in limited circumstances. New *substantive* rules generally apply retroactively. This includes decisions that narrow the scope of a criminal statute by interpreting its terms, as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish. Such rules apply retroactively because they "necessarily carry a significant risk that a defendant stands convicted of 'an act that the law does not make criminal' " or faces a punishment that the law cannot impose upon him.

---

[102] *Whorton*, 549 US at 418 (citations and quotation marks omitted).

[103] *Id.* at 416 (citations and quotation marks omitted).

[104] *Graham*, 506 US at 467.

New rules of procedure, on the other hand, generally do not apply retroactively. They do not produce a class of persons convicted of conduct the law does not make criminal, but merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise. Because of this more speculative connection to innocence, we give retroactive effect to only a small set of " 'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." That a new procedural rule is "fundamental" in some abstract sense is not enough; the rule must be one "without which the likelihood of an accurate conviction is *seriously* diminished." This class of rules is extremely narrow, and "it is unlikely that any . . . 'ha[s] yet to emerge.' "[105]

There is no dispute within this Court, by the litigants involved in this appeal or premised in federal law that *Miller* is applicable to all cases "pending on direct review or not yet final."[106] What remains for this Court to determine is whether *Miller* is also to be applied retroactively to those cases on collateral review.

### 2. *MILLER*'S NEW RULE IS PROCEDURAL

Having determined that *Miller* comprises a new rule, the next step in the analysis is for this Court to discern whether the new rule is substantive or procedural in nature and, if procedural, whether it falls within a recognized exception to the rule of nonretroactivity. As noted, our decision whether *Miller* is to be applied retroactively to cases on collateral review will be dispositive of Carp's appeal. Carp's appeal is, without question, before us on collateral review. If *Miller*'s new rule is substantive, we can apply it retroactively in such

---

[105] *Schriro v Summerlin*, 542 US 348, 351-352; 124 S Ct 2519; 159 L Ed 2d 442 (2004) (citations omitted) (alteration in orginal).

[106] *Teague*, 489 US at 304-305; see also *Davis v United States*, 564 US ___; 131 S Ct 2419, 2430; 180 L Ed 2d 285 (2011).

collateral review to consider the merits of Carp's appeal. If, however, *Miller*'s new rule is procedural only and fails to meet any of the delineated *Teague* exceptions, then we cannot apply it retroactively to Carp's appeal.

While the "distinction between substance and procedure is an important one,"[107] it is not necessarily always a simple matter to divine.[108] The United States Supreme Court has indicated that decisions of "criminal procedure" encompass those which implicate the functioning of the criminal trial process. Retroactivity of new procedural rules is severely limited, as only substantive new rules or decisions of "procedure" that incorporate into the criminal trial process a mechanism " 'without [which] the likelihood of an accurate conviction is seriously diminished,' " referred to as "watershed rules," are to be applied retroactively.[109] Only these two exceptions have been identified to the "general rule of nonretroactivity for cases on collateral review."[110] In summary, as described by the *Teague* Court:

> First, a new rule should be applied retroactively if it places "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." Second, a new rule should be applied retroactively if it requires the observance of "those procedures that . . . are 'implicit in the concept of ordered liberty.' "[111]

Decisions characterized as comprising "substantive criminal law" extend beyond issues of procedural function and address the meaning, scope, and application of

---

[107] *Bousley v United States*, 523 US 614, 620; 118 S Ct 1604; 140 L Ed 2d 828 (1998).

[108] *Robinson v Neil*, 409 US 505, 509; 93 S Ct 876; 35 L Ed 2d 29 (1973).

[109] *Bousley*, 523 US at 620, quoting *Teague*, 489 US at 313.

[110] *Teague*, 489 US at 307.

[111] *Id.* (citations omitted).

substantive criminal statutes.[112] In contrast, *Teague* has established that a new rule is procedural if it affects the operation of the criminal trial process.[113] By way of clarification: "A rule is substantive rather than procedural if it alters the range of conduct or the class of persons that the law punishes. In contrast, rules that regulate only the *manner of determining* the defendant's culpability are procedural."[114]

Examining *Miller*'s language and historical precedents, we find that it is procedural in nature. We recognize that *Roper* and *Graham* "establish[ed] that children are constitutionally different from adults for purposes of sentencing."[115] And unlike its predecessors, *Miller* specifically eschews a categorical ban on sentencing juveniles to life in prison without parole.[116] The *Miller* Court indicated that its ruling was procedural in nature, stating, "Our decision *does not categorically bar* a penalty for a class of offenders or type of crime—as, for example, we did in *Roper* or *Graham*. Instead, it *mandates only that a sentence follow a certain process*—considering an offender's youth and attendant characteristics—before imposing a particular penalty."[117] Targeted prohibitions are by definition less restrictive than a categorical ban.[118] While the *Miller* Court opined that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncom-

---

[112] *Bousley*, 523 US at 620; see also *Davis v United States*, 417 US 333, 346; 94 S Ct 2298; 41 L Ed 2d 109 (1974) (indicating that included within the definition of "substantive" are those decisions that remove primary conduct from the purview of criminal punishment).

[113] *Bousley*, 523 US at 620.

[114] *Schriro*, 542 US at 353 (citations omitted).

[115] *Miller*, 567 US at ___; 132 S Ct at 2464.

[116] *Id.* at ___; 132 S Ct at 2459, 2469.

[117] *Id.* at ___; 132 S Ct at 2471 (emphasis added).

[118] *United States v Playboy Entertainment Group, Inc*, 529 US 803, 815; 120 S Ct 1878; 146 L Ed 2d 865 (2000).

mon," it specifically did not "foreclose a sentencer's ability to make that judgment in homicide cases . . . ."[119] When stating its ruling, the Court reiterated:

> Our decision does not categorically bar a penalty for a class of offenders or type of crime—as, for example, we did in *Roper* or *Graham*. Instead, it mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty. And in so requiring, our decision flows straightforwardly from our precedents: specifically, the principle of *Roper*, *Graham*, and our individualized sentencing cases that youth matters for purposes of meting out the law's most serious punishments.[120]

Consistently with the Court's reference to and reliance on its earlier decisions, *Graham* justified and distinguished its imposition of a categorical ban of a mandatory sentence of life without parole for nonhomicide offenders by indicating:

> The Court has recognized that defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers. There is a line "between homicide and other serious violent offenses against the individual." Serious nonhomicide crimes "may be devastating in their harm . . . but 'in terms of moral depravity and of the injury to the person and to the public,' . . . they cannot be compared to murder in their 'severity and irrevocability.' " This is because "[l]ife is over for the victim of the murderer," but for the victim of even a very serious nonhomicide crime, "life . . . is not over and normally is not beyond repair." Although an offense like robbery or rape is "a serious crime deserving serious punishment," those crimes differ from homicide crimes in a moral sense.[121]

---

[119] *Miller*, 567 US at ___; 132 S Ct at 2469.

[120] *Id.* at ___; 132 S Ct at 2471.

[121] *Graham*, 560 US at ___; 130 S Ct at 2027 (citations omitted).

In *Graham*, the Court drew a line and distinguished between homicide and nonhomicide juvenile offenders and the sentences that could be imposed in conformance with the Eighth Amendment. That distinction was reasserted in the *Miller* Court's refusal to impose a categorical ban regarding the sentencing of juvenile homicide offenders to life in prison without parole.

Our determination that *Miller* does not comprise a substantive new rule and, therefore, is not subject to retroactive application for cases on collateral review is supported by the fact that the ruling does not place "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe."[122] *Miller* does not alter the elements necessary for a homicide conviction. Rather it simply necessitates the consideration of certain factors, when juveniles are involved, in sentencing. In other words, *Miller* is not substantive because it does not serve to "alter[] the range of conduct or the class of persons that the law punishes,"[123] but merely the manner in which a punishment may be imposed. Juveniles can still be subject to a sentence of life in prison without parole. It is simply the manner and factors to be considered in the imposition of that particular sentence that *Miller* dictates, rendering the ruling procedural and not substantive in nature.

### 3. *MILLER* IS NOT A WATERSHED RULE OF LAW

This does not, however, end our inquiry. While *Miller* does not meet the substantive exception recognized in *Teague*, a second exception exists, which may render a new procedural rule retroactive on collateral review. "A

---

[122] *Teague*, 489 US at 307 (citation and quotation marks omitted).

[123] *Schriro*, 542 US at 353.

new rule applies retroactively in a collateral proceeding only if . . . the rule is a 'watershed rul[e] of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding."[124] "In order to qualify as watershed, a new rule must meet two requirements. First, the rule must be necessary to prevent an impermissibly large risk of an inaccurate conviction. Second, the rule must alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding."[125] In applying these requirements, it is instructive to review *Gideon v Wainwright*,[126] as it comprises the only case to date "identified as qualifying under the [watershed] exception."[127] The *Gideon* Court "held that counsel must be appointed for any indigent defendant charged with a felony. When a defendant who wishes to be represented by counsel is denied representation, *Gideon* held, the risk of an unreliable verdict is intolerably high. The new rule announced in *Gideon* eliminated this risk."[128]

The *Miller* ruling fails to satisfy the initial requirement pertaining to an "impermissibly large risk of an inaccurate conviction."[129] *Miller* deals exclusively with sentencing and does not pertain to criminal trial procedures leading to conviction. *Miller* is focused solely on accuracy in sentencing and does not address or impinge on the accuracy of a juvenile defendant's conviction for a homicide offense. Addressing the second criteria that a watershed rule "must alter our understanding of the

---

[124] *Whorton*, 549 US at 416, citing *Saffle v Parks*, 494 US 484, 495; 110 S Ct 1257; 108 L Ed 2d 415 (1990), quoting *Teague*, 489 US at 311.

[125] *Whorton*, 549 US at 418 (citations and quotation marks omitted).

[126] *Gideon*, 372 US at 335.

[127] *Whorton*, 549 US at 419.

[128] *Id.*

[129] *Id.* at 418.

bedrock procedural elements essential to the fairness of a proceeding,"[130] the decision in *Miller* is not comparable to the rule the Court announced in *Gideon.* The *Miller* ruling has a more restrictive scope of application and does not relate to the accuracy of the fact-finding process.[131] Further, this second requirement to establish a watershed rule "cannot be met simply by showing that a new procedural rule is based on a 'bedrock' right."[132]

The United States Supreme Court has consistently found "that the *Teague* bar to retroactivity applies to new rules that are based on 'bedrock' constitutional rights" and "[t]hat a new procedural rule is 'fundamental' in some abstract sense is not enough."[133] Specifically, "in order to meet this requirement, a new rule must itself constitute a previously unrecognized bedrock procedural element that is essential to the fairness of a proceeding. In applying this requirement, we again look to the example of *Gideon,* and 'we have not hesitated to hold that less sweeping and fundamental rules' do not qualify."[134] While *Miller* will indisputably have an effect on sentencing procedures for juveniles, it cannot be construed to qualify as being "in the same category with *Gideon* [in having] effected a profound and sweeping change."[135]

We must address one final issue of federal law before finalizing our determination on retroactivity. Carp and the amici curiae contend that the *Miller* Court impliedly rendered its decision retroactive through the

---

[130] *Id.* at 418 (citations and quotation marks omitted).

[131] *Id.* at 419.

[132] *Id.* at 420-421.

[133] *Id.* at 421 (citations and quotation marks omitted).

[134] *Id.* (citations omitted).

[135] *Id.* (citations and quotation marks omitted).

remand of the companion case of *Jackson v Hobbes*, which they assert was clearly before the Court on collateral review. State convictions and sentences are final "for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied."[136] Specifically, Carp contends that in the companion case, Jackson had fully expended his appellate rights because the Arkansas Supreme Court had affirmed his convictions and, subsequently, dismissed his petition for habeas corpus.[137] Yet the *Miller* Court granted certiorari to both *Miller* and *Jackson*.[138]

Contrary to Carp's contention, the mere fact that the Court remanded Jackson for resentencing does not constitute a ruling or determination on retroactivity. Specifically:

> The only way the Supreme Court can, by itself, "lay out and construct" a rule's retroactive effect, or "cause" that effect "to exist, occur, or appear," is through a holding. The Supreme Court does not "ma[k]e" a rule retroactive when it merely establishes principles of retroactivity and leaves the application of those principles to lower courts. In such an event, any legal conclusion that is derived from the principles is developed by the lower court (or perhaps by a combination of courts), not by the Supreme Court. We thus conclude that a new rule is not "made retroactive to cases on collateral review" unless the Supreme Court holds it to be retroactive.[139]

In addition:

---

[136] *Caspari v Bohlen*, 510 US 383, 390; 114 S Ct 948; 127 L Ed 2d 236 (1994).

[137] *Miller*, 567 US at ___; 132 S Ct at 2461.

[138] *Id.* at ___; 132 S Ct at 2463.

[139] *Tyler v Cain*, 533 US 656, 663; 121 S Ct 2478; 150 L Ed 2d 632 (2001).

[t]he nonretroactivity principle *prevents* a federal court from granting habeas corpus relief to a state prisoner based on a rule announced after his conviction and sentence became final. A threshold question in every habeas case, therefore, is whether the court is obligated to apply the *Teague* rule to the defendant's claim. We have recognized that the nonretroactivity principle "is not 'jurisdictional' in the sense that [federal courts] . . . must raise and decide the issue *sua sponte*." Thus, a federal court may, but need not, decline to apply *Teague* if the State does not argue it. But if the State does argue that the defendant seeks the benefit of a new rule of constitutional law, the court *must* apply *Teague* before considering the merits of the claim.[140]

This is consistent with the Court's determination in *Schiro v Farley*, which provides:

Nevertheless, the State failed to argue *Teague* in its brief in opposition to the petition for a writ of certiorari. In deciding whether to grant certiorari in a particular case, we rely heavily on the submissions of the parties at the petition stage. If, as in this case, a legal issue appears to warrant review, we grant certiorari in the expectation of being able to decide that issue. Since a State can waive the *Teague* bar by not raising it, and since the propriety of reaching the merits of a dispute is an important consideration in deciding whether or not to grant certiorari, the State's omission of any *Teague* defense at the petition stage is significant. Although we undoubtedly have the discretion to reach the State's *Teague* argument, we will not do so in these circumstances.[141]

In *Jackson*, because the State did not raise the issue of retroactivity, the necessary predicate for the Court to resolve the question of retroactivity was waived. Hence,

---

[140] *Caspari*, 510 US at 389 (citations omitted).

[141] *Schiro v Farley*, 510 US 222, 229; 114 S Ct 783; 127 L Ed 2d 47 (1994) (citations omitted).

merely because *Jackson* was before the Court on collateral review is not dispositive on the issue of retroactivity.

### 4. *MILLER* IS NOT APPLICABLE UNDER MICHIGAN LAW TO CASES ON COLLATERAL REVIEW

Before concluding our analysis that *Miller* is not retroactive under federal law, we must also address whether Michigan law would require its retroactive application. At the outset, we note, "A state may accord broader effect to a new rule of criminal procedure than federal retroactivity jurisprudence accords."[142] We also note that the Michigan Supreme Court has stated, "Michigan law has regularly declined to apply new rules of criminal procedure to cases in which a defendant's conviction has become final."[143] Our Supreme Court has delineated three factors in determining the retroactivity of a new rule of criminal procedure: "(1) the purpose of the new rule[]; (2) the general reliance on the old rule[;] and (3) the effect of retroactive application of the new rule on the administration of justice."[144] Addressing the "purpose prong" as the first of the three factors to be considered, our Supreme Court has stated that "a law may be applied retroactively when it ' "concerns the ascertainment of guilt or innocence" ' "; however, " ' "a new rule of procedure . . . which does not affect the integrity of the fact-finding process should be given prospective effect." ' "[145] Because *Miller* is not concerned with "the ascertainment of guilt or innocence"

---

[142] *People v Maxson*, 482 Mich 385, 392; 759 NW2d 817 (2008), citing *Danforth*, 552 US at 287-288.

[143] *Maxson*, 482 Mich at 392-393.

[144] *Id.* at 393 (citation and quotation marks omitted).

[145] *Id.*, quoting *People v Sexton*, 458 Mich 43, 63; 580 NW2d 404 (1998), quoting *People v Young*, 410 Mich 363, 367; 301 NW2d 803 (1981).

and "does not affect the integrity of the fact-finding process,"[146] this first prong militates against retroactivity.

Under the second prong, "a defendant who relied on the old rule ... must also have *suffered actual harm* ...."[147] While undoubtedly some defendants could receive sentencing relief should we apply *Miller* retroactively, "this would be true of extending *any* new rule retroactively, yet this is not generally done."[148] In this instance, there is no guarantee that Carp or any defendant would receive relief because *Miller* is not a categorical ban of life-without-parole sentences. Our Supreme Court implies that even if this prong is favorable to a defendant, it is not dispositive to the issue of retroactivity. "Instead, we must consider, as best as possible, the extent of the detrimental reliance on the old rule, and then balance this against the other *Sexton* factors, as well as against the fact that each defendant ... has received all the rights under the law to which he or she was entitled at the time."[149]

Our Supreme Court has indicated that the final prong pertaining to the effect of retroactive application on the administration of justice involves a determination of whether "[t]he state's strong interest in finality of the criminal justice process would be undermined ...."[150] Citing federal decisions, the *Maxson* Court opined:

> "[F]inality of state convictions is a *state* interest ... that States should be free to evaluate, and weigh the importance of, when prisoners held in state custody are seeking a

---

[146] *Maxson*, 482 Mich at 393 (citations and quotation marks omitted).

[147] *Id.* at 396.

[148] *Id.* at 397.

[149] *Id.*

[150] *Id.* at 397.

remedy for a violation of federal rights by their lower
courts." The principle of finality "is essential to the opera-
tion of our criminal justice system." The state's interest in
finality discourages the advent of new rules from "continu-
ally forc[ing] the State[ ] to marshal resources in order to
keep in prison defendants whose trials and appeals con-
formed to then-existing constitutional standards[.]"[151]

While undoubtedly retroactive application could re-
sult in a number of juveniles convicted of homicide and
sentenced under the mandatory scheme of life in prison
without parole to some relief if resentenced, there exists
a commensurate concern regarding the effect of these
potential appeals on our limited judicial resources.
Consistent with our Supreme Court's decision in *Max-
son*, "it is our judgment that those resources would be
better preserved for defendants currently charged [or
pending on direct review]—some of whom may be . . .
entitled to relief . . . ."[152] Particularly when viewed in
conjunction with our determination under federal law,
we find that under Michigan law *Miller* is not subject to
retroactive application to cases on collateral review.

Finally, while lacking precedential value, we note
that Florida appellate courts have recently reached the
same conclusion regarding the retroactive application
of *Miller* to cases on collateral review.[153] While the
analysis of the Florida courts is of limited value as
relying almost exclusively on state law, we find the
reasoning, analysis, and ultimate conclusions to be
instructive and consistent with that of this Court.[154]

---

[151] *Id.* at 398 (citations omitted).

[152] *Id.* at 398-399.

[153] *Geter v State*, ___ So 3d ___ (Fla App, 2012) (opinion issued
September 27, 2012, in Case No. 3D12-1736); see also *Gonzalez v State*,
101 So 3d 886 (Fla App, 2012).

[154] *People v Conrad*, 148 Mich App 433, 439; 385 NW2d 277 (1986).

VI. APPLICATION OF *MILLER* TO SENTENCING IN MICHIGAN

A. INTRODUCTION

We recognize that the ultimate authority to determine penalties for criminal offenses is constitutionally vested in the Legislature,[155] while the authority to impose sentences and to administer statutory law governing sentencing that the Legislature enacts lies with the judiciary.[156] We also readily acknowledge that "a court's constitutional obligation is to interpret, not rewrite, the law" and that "[a]ny responsibility to rewrite the statutes lies with the Legislature."[157] While cognizant of our role, we also recognize our duty to the trial courts that will face sentencing issues in pending cases and which can be anticipated on remand. We must, we believe, provide guidance to these trial courts to ensure a consistency of approach until the Legislature can respond by reworking the sentencing scheme for juveniles in Michigan to be in accord with *Miller*. We urge the Legislature to take up its task quickly in this matter. But we find it unacceptable in the interim to simply remand cases to the trial courts for resentencing. Without such guidance, the trial courts will be caught between the *Miller* Court's ruling that a mandatory life sentence without parole for a juvenile convicted of homicide is constitutionally defective while simultaneously required by the current statutory scheme in Michigan to impose such a sentence. We therefore provide the following to ensure individualized sentencing for juveniles convicted of homicide, while simultaneously affording a standardized methodology

---

[155] Const 1963, art 4, § 45.

[156] See MCL 769.1(1).

[157] *Salter v Patton*, 261 Mich App 559, 565-566; 682 NW2d 537 (2004) (citations and quotation marks omitted).

for the lower courts to implement pending the action of our Legislature. In doing so, this Court seeks to minimize its intrusion and to leave the smallest footprint possible on any legislative function.

B. *MILLER*'S PARAMETERS

Because we "are bound by the decisions of the United States Supreme Court construing federal law,"[158] it is important to delineate the exact parameters of *Miller* in order to determine the means to best carry out the *Miller* decision while commensurately obtaining the least disruption to our sentencing system for juveniles. Consistent with *Graham*, the *Miller* Court's ruling requires "sentencing authorities consider the characteristics of a [juvenile] defendant and the details of his offense before sentencing him . . . ."[159] Specifically, "youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole."[160]

The brunt of the *Miller* Court's criticism of mandatory sentencing schemes of life imprisonment without parole for juveniles is that such schemes "prevent[] those meting out punishment from considering a juvenile's 'lessened culpability' and greater 'capacity for change,' and runs afoul of our cases' requirement of individualized sentencing for defendants facing the most serious penalties."[161] To achieve the goal of individualized sentencing for juveniles, the *Miller* Court

---

[158] *Jaqua v Canadian Nat'l R, Inc*, 274 Mich App 540, 546; 734 NW2d 228 (2007) (quotation marks omitted), citing *Chesapeake & O R Co v Martin*, 283 US 209, 220-221; 51 S Ct 453; 75 L Ed 983 (1983).

[159] *Miller*, 567 US at ___; 132 S Ct at 2463-2464.

[160] *Id.* at ___; 132 S Ct at 2465.

[161] *Id.* at ___; 132 S Ct at 2460, quoting *Graham*, 130 S Ct at 2026-2027, 2029-2030.

repeatedly emphasized the necessity for "sentencing authorities [to] consider the characteristics of a defendant and the details of his offense before sentencing . . . ."[162] Having found that " '[a]n offender's age' . . . 'is relevant to the Eighth Amendment,' " the *Miller* Court explicitly determined that " 'criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed.' "[163]

This does not, however, imply that a sentencing court has unfettered discretion when sentencing a juvenile. Rather, the focus is on the discretion of the sentencer to determine whether to impose the harshest penalty of life without the possibility of parole on a juvenile convicted of a homicide offense. Specifically, the *Miller* Court stated:

> But the mandatory penalty schemes at issue here prevent the sentencer from taking account of these central considerations. By removing youth from the balance—by subjecting a juvenile to the same life-without-parole sentence applicable to an adult—these laws prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender. That contravenes *Graham's* (and also *Roper's*) foundational principle: that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children.
>
> And *Graham* makes plain these mandatory schemes' defects in another way: by likening life-without-parole sentences imposed on juveniles to the death penalty itself. Life-without-parole terms, the Court wrote, "share some characteristics with death sentences that are shared by no other sentences." Imprisoning an offender until he dies alters the remainder of his life "by a forfeiture that is irrevocable." And this lengthiest possible incarceration is

---

[162] *Miller*, 567 US at ___; 132 S Ct at 2463-2464.

[163] *Id.* at ___; 132 S Ct at 2466, quoting *Graham*, 130 S Ct at 2031.

an "especially harsh punishment for a juvenile," because he will almost inevitably serve "more years and a greater percentage of his life in prison than an adult offender." The penalty when imposed on a teenager, as compared with an older person, is therefore "the same . . . in name only." All of that suggested a distinctive set of legal rules: In part because we viewed this ultimate penalty for juveniles as akin to the death penalty, we treated it similarly to that most severe punishment. We imposed a categorical ban on the sentence's use, in a way unprecedented for a term of imprisonment. And the bar we adopted mirrored a proscription first established in the death penalty context—that the punishment cannot be imposed for any nonhomicide crimes against individuals.

That correspondence—*Graham's* "[t]reat[ment] [of] juvenile life sentences as analogous to capital punishment,"—makes relevant here a second line of our precedents, demanding individualized sentencing when imposing the death penalty. [W]e [have] held that a statute mandating a death sentence for first-degree murder violated the Eighth Amendment. We thought the mandatory scheme flawed because it gave no significance to "the character and record of the individual offender or the circumstances" of the offense, and "exclud[ed] from consideration . . . the possibility of compassionate or mitigating factors." Subsequent decisions have elaborated on the requirement that capital defendants have an opportunity to advance, and the judge or jury a chance to assess, any mitigating factors, so that the death penalty is reserved only for the most culpable defendants committing the most serious offenses.[164]

This language indicates that the *Miller* Court is directing that sentencing courts not impose "the harshest term of imprisonment," life without possibility of parole, on juveniles without having first determined if such a sentence is appropriate based on the offender's youth and the circumstances applicable to the particular case to ensure an individualized and proportionate

---

[164] *Miller*, 567 US at ___; 132 S Ct at 2466-2467.

sentence. Contrary to the arguments of the amici curiae
and Carp in response to this Court's request to address
procedural or application issues in juvenile sentencing
in their briefs, the *Miller* Court does not require Michi-
gan or other states with similar mandatory sentencing
schemes to abrogate or abandon a hierarchical method-
ology of sentencing for those convicted of first-degree
murder or to necessitate a term of years sentence
consistent with a lesser offense, such as second-degree
murder. Instead, a sentencing court must, considering
factors of youth, have the discretion to determine
whether a juvenile convicted of homicide will have
imposed on him or her the harshest penalty of life in
prison without parole or be entitled to life in prison
with the possibility of parole.

We base this conclusion on several factors. First, the
*Miller* Court in its reliance on *Roper* and *Graham*
emphasized:

> [O]ur individualized sentencing cases alike teach that *in
> imposing a State's harshest penalties*, a sentencer misses
> too much if he treats every child as an adult. To recap:
> *Mandatory life without parole* for a juvenile precludes
> consideration of his chronological age and its hallmark
> features—among them, immaturity, impetuosity, and fail-
> ure to appreciate risks and consequences.
>
>        \* \* \*
>
> We therefore hold that the *Eighth Amendment forbids a
> sentencing scheme that mandates life in prison without
> possibility of parole* for juvenile offenders. By making youth
> (and all that accompanies it) irrelevant to imposition of
> that harshest prison sentence, such a scheme poses too
> great a risk of disproportionate punishment. *Because that
> holding is sufficient to decide these cases, we do not
> consider* Jackson's and Miller's alternative *argument that
> the Eighth Amendment requires a categorical bar on life*

*without parole for juveniles*, or at least for those 14 and younger. But given all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between "the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." Although *we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.*[165]

Second, this is consistent with the Court's explication of its holding in *Graham*, where it distinguished between "defendants who do not kill, intend to kill, or foresee that life will be taken" as being less deserving "of the most serious forms of punishment" from those juveniles who are "murderers."[166] It would, therefore, be inconsistent to sentence juveniles who commit murder to a sentence that is not proportional to the severity of the crime. In addition, the *Graham* Court clearly stated:

A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State must do, however, is give defendants . . . some *meaningful opportunity to obtain release* based on demonstrated maturity and rehabilitation. It is for the State, in the first instance, to explore the means and mechanisms for compliance. It bears emphasis, however, that while the Eighth Amendment forbids a State from imposing a life without parole sentence on a juvenile nonhomicide of-

---

[165] *Id.* at ___; 132 S Ct at 2468, 2469 (citations omitted, emphasis added).

[166] *Graham*, 560 US at ___; 130 S Ct at 2027.

fender, *it does not require the State to release that offender during his natural life. Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives.* The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does forbid States from making the judgment at the outset that those offenders never will be fit to reenter society.[167]

Finally, first-degree murder is consistently acknowledged as "the most serious of offenses."[168] Concomitant with the severity of the offense is the proportionality of the punishment. "The Eighth Amendment's history and the development of its decisional law firmly support the conclusion that length of imprisonment can be sufficiently disproportionate to the underlying crime to be cruel and unusual punishment."[169] "['I]t is a precept of justice that punishment for crime should be graduated and proportioned to [the] offense.' "[170]

But proportionality is a two-edge sword. A sentence may not be so severe that it constitutes cruel and unusual punishment given the circumstances or severity of the offense. On the other hand, a sentence may not be so light that the punishment fails to fit the serious nature of the crime:

There is no judicial function which makes larger drafts upon the fairness, common sense, sanity, and good judgment of the judge than that of fixing penalties for criminal

---

[167] *Id.* at ___; 130 S Ct at 2030 (emphasis added).

[168] *Lambert v Blodgett*, 393 F3d 943, 956 (CA 9, 2004); see also *Lizama v United States Parole Comm*, 245 F3d 503, 505 (CA 5, 2001); *Baggett v Keller*, 796 F Supp 2d 718, 730 (ED NC, 2011).

[169] *Carmona v Ward*, 576 F2d 405, 420 (CA 2, 1978).

[170] *Atkins v Virginia*, 536 US 304, 311; 122 S Ct 2242; 153 L Ed 2d 335 (2002), quoting *Weems v United States*, 217 US 349; 30 S Ct 544; 54 L Ed 793 (1910).

offenses, nor one which more vitally affects the stability of free institutions. Excessive penalties are tyrannical in the court, and abhorrent to the public; on the other hand, penalties unduly mild seriously embarrass law enforcement and encourage infractions of the criminal laws.[171]

Consequently, under *Miller* the provision of discretion in sentencing to achieve an individualized result does not equate to unlimited or unfettered authority to impose any type of penalty. While individualized with regard to considerations of youth, any sentence imposed on a juvenile convicted of homicide must also recognize the severity of the offense committed, resulting in a sentence that accordingly reflects the severity of the offense.

We specifically reject the contention that an appropriate alternative would be to sentence a convicted juvenile homicide offender to a term of years consistent with second-degree murder as the next step in penalty gradation from first-degree murder. While not absolute, in many cases involving first-degree murder a sentencing court also instructs the finder of fact on second-degree murder as a lesser included offense.[172] In these instances, when a jury determines that the juvenile is guilty of first-degree murder, it has rejected the possibility that he or she is guilty of the lesser offense. When a jury has had the option and specifically rejected attribution of guilt to a lower level offense, any failure to recognize and afford weight to the jury's verdict by imposing a penalty inconsistent with the level of offense that the jury determines as the basis for the verdict of guilt would offend the premise of proportionality in seeking to ensure that the punishment imposed fits the crime.

---

[171] *Hawkins v United States*, 14 F2d 596, 598 (CA 7, 1926).

[172] See *People v Cornell*, 466 Mich 335, 358 n 13; 646 NW2d 127 (2002) (nothing that an instruction on second-degree murder, as a lesser included offense of first-degree murder, is not automatically required).

### C. A PERFECT STORM: THE MICHIGAN SENTENCING SCHEME FOR JUVENILES WHO COMMIT HOMICIDE

There are three Michigan statutes that intersect to create an unconstitutional perfect storm under *Miller*. Those statutes are: MCL 750.316(1), mandating a life sentence for any person convicted of first-degree murder; MCL 769.1(1)(g), requiring courts to sentence any juvenile convicted of first-degree murder in the same manner as an adult; and MCL 791.234(6)(a), excluding any prisoner serving a life sentence for first-degree murder from eligibility for parole. In our view, however, all the statutes are not unconstitutional under *Miller*. Rather, as we explain below, only one of them is: MCL 791.234(6)(a), which provides that a prisoner sentenced to life imprisonment for first-degree murder "is not eligible for parole."

### D. MEETING *MILLER*'S REQUIREMENTS IN MICHIGAN

To fulfill the strictures of *Miller* sentencing courts are required to determine, considering the factors of youth and the serious nature of the offense, whether to sentence the juvenile convicted of a homicide offense to life without the possibility of parole or to sentence such a juvenile offender to a life sentence with the potential for parole. To fulfill this mandate and as a consequence of this opinion, we find that the current statutory provision, MCL 791.234(6)(a), which provides that a prisoner sentenced to life imprisonment for first-degree murder "is not eligible for parole" to be unconstitutional as written and as applied to juvenile offenders convicted of homicide. This statute fails to acknowledge a sentencing court's discretion to determine that a convicted juvenile homicide offender may be eligible for parole.

*Miller* also provides direction regarding the factors a sentencing court should consider. While not inclusive, the *Miller* Court specifically indicates factors to be considered at sentencing to include: (a) "the character and record of the individual offender [and] the circumstances of the offense,"[173] (b) "the chronological age of the minor,"[174] (c) "the background and mental and emotional development of a youthful defendant,"[175] (d) "the family and home environment,"[176] (e) "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected [the juvenile],"[177] (f) whether the juvenile "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth,"[178] and (g) the potential for rehabilitation.[179] It is important to recognize that the trial court must consider these factors at the time of sentencing in determining the eligibility for parole. Discretion by the trial court at the outset of proceedings in determining whether to try a juvenile as an adult is not sufficient to meet the mandate.[180] The *Miller* Court indicated the importance of the timing of the considerations of youth, stating that "the question at transfer hearings may differ dramatically from the issue at a post-trial sentencing" and noting that "[d]iscretionary sentencing in adult court would provide different options: There, a judge or jury could choose, rather than a

---

[173] *Miller*, 567 US at ___; 132 S Ct at 2467 (citation and quotation marks omitted).

[174] *Id.* at ___; 132 S Ct at 2467.

[175] *Id.* at ___; 132 S Ct at 2467.

[176] *Id.* at ___; 132 S Ct at 2468.

[177] *Id.* at ___; 132 S Ct at 2468.

[178] *Id.* at ___; 132 S Ct at 2468.

[179] *Id.* at ___; 132 S Ct at 2468.

[180] *Id.* at ___; 132 S Ct at 2474.

life-without-parole sentence, a lifetime prison term *with* the possibility of parole or a lengthy terms of years."[181] Specifically, "the discretion available to a judge at the transfer stage cannot substitute for discretion at post-trial sentencing in adult court—and so cannot satisfy the Eighth Amendment."[182]

While *Miller* does not guarantee a convicted juvenile homicide offender parole, *Miller* and its predecessors do mandate that a meaningful review and consideration must be afforded by the sentencing court, which has at least the potential to be realized. Carp and the amici curiae raise legitimate concerns about whether the court's discretion in sentencing a juvenile homicide offender to life with the possibility of parole will actually result in a meaningful review by the Parole Board premised on its "life means life" policy.[183] We acknowledge that the release of a prisoner on parole is discretionary by the Parole Board,[184] and, based on that discretion, a prisoner does not possess a protected liberty interest in being paroled before the expiration of his or her sentence.[185] Since 1982, legislative changes have occurred affecting not only the structure and composition of the Parole Board, but also "the procedure for paroling inmates sentenced to parolable life."[186] Historically:

---

[181] *Id.* at ___; 132 S Ct at 2474-2475.

[182] *Id.* at ___; 132 S Ct at 2475.

[183] See *People v Scott*, 480 Mich 1019; 743 NW2d 62 (2008) (MARILYN KELLY, J., dissenting).

[184] *In re Parole of Johnson*, 235 Mich App 21, 24-25; 596 NW2d 202 (1999).

[185] *Crump v Lafler*, 657 F3d 393, 404 (CA 6, 2011) ("There is no legitimate claim of entitlement to parole [in Michigan], and thus no liberty interest in parole.") (citation and quotation marks omitted).

[186] *Foster v Booker*, 595 F3d 353, 357 (CA 6, 2010).

Until 1982, inmates sentenced to parolable life could expect an initial interview with the Board after having served seven years, with subsequent interviews "at no greater than 36-month intervals following the initial interview" . . . . In 1982, the Michigan Legislature amended the law to require the initial interview at the four-year mark with subsequent interviews "biennially thereafter" . . . . The Legislature changed the law again a decade later such that, as of 1992, a Board member is not statutorily required to interview an inmate sentenced to parolable life before the inmate comes within the Board's jurisdiction. Rather, the initial interview is required only after the inmate has served ten years. Moreover, as of 1992, the inmate could expect to be reinterviewed as infrequently as every five years, . . . not every two or three years as had been the previous practice.

In 1999, the Legislature eliminated the statutory reinterview requirement altogether. As a result, as of 1999, a Board member need only interview an inmate sentenced to parolable life after the inmate has served ten years. Interviews take place "thereafter as determined by the" Board. Rather than requiring regular reinterview of an inmate, the statute now requires the Board to *review* the inmate's paper file at five-year intervals. . . . [H]owever, . . . in practice, the Board exercises its discretion to reinterview an inmate every ten years following the initial ten-year interview.

Legislative changes in 1999 also curtailed an inmate's right to judicial review of the denial of parole. The Legislature had made an inmate's right to appeal explicit in 1982 by providing that the "action of the parole board in granting or denying a parole shall be appealable to the circuit court." Before 1982, the law had provided only that the Board's action of releasing an inmate was "not . . . reviewable if in compliance with law." As a result of the 1999 amendments, only the prosecutor or the victim of an inmate's crime has a statutory right to appeal the Board's decision to grant parole.

. . . [I]n the 1990s the Board stopped providing written reasons to explain its lack of interest in moving an inmate

forward to a public hearing. This change appears to have been within the statutory discretion of the Board. Since 1982, Michigan law has required that "[w]hen the parole board makes a final determination not to release a prisoner, the prisoner shall be provided with a written explanation of the reason for denial." The Michigan Court of Appeals in 2001, by interpreting "final determination" to mean determinations that had progressed through all the steps in the parole eligibility process, refused to require a written explanation at the "no interest" stage.[187]

Concerns regarding the Parole Board's exercise of discretion may also necessitate the involvement of our Legislature to study the current Parole Board procedure and ascertain whether it will require adaptation following *Miller*. We recognize that "the determination of parole eligibility is a separate phase of the criminal justice process . . . ."[188] But the Parole Board cannot effectively ignore the determination of the sentencing court and must respect its decision following conviction of a juvenile homicide offender to life with the possibility of parole. In an earlier decision, the United States Supreme Court explained that

> where parole is concerned discretion, by its very definition, is subject to changes in the manner in which it is informed and then exercised. The idea of discretion is that it has the capacity, and the obligation, to change and adapt based on experience. New insights into the accuracy of predictions about the offense and the risk of recidivism consequent upon the offender's release, along with a complex of other factors, will inform parole decisions.[189]

Along with the sentencing court, the Parole Board must truly exercise the discretion granted to it and not

---

[187] *Id.* at 357-358 (citations omitted).

[188] See *Augustine v Brewer*, 821 F2d 365, 369 n 2 (CA 7, 1987).

[189] *Garner v Jones*, 529 US 244, 253; 120 S Ct 1362; 146 L Ed 2d 236 (2000).

abdicate its responsibility by the automatic imposition, in the case of juvenile homicide offenders, of its "life means life" policy. *Miller* necessitates the sentencing court's exercise of discretion in determining whether to sentence a juvenile homicide offender to life in prison with the possibility of parole. And logic dictates that to effectuate the sentence that the sentencing court imposes, the Parole Board must respect the sentencing court's decision by also providing a meaningful determination and review when parole eligibility arises.

We must address a further important discrepancy between *Miller* and our current sentencing scheme for juveniles in Michigan. That discrepancy involves the very definition of who qualifies as a juvenile. *Miller* defines juvenile as comprising "those under the age of 18 at the time of their crimes . . . ."[190] The same definition is evident in *Graham*'s acknowledgement that "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood, those who were below that age when the offense was committed may not be sentenced to life without parole for a nonhomicide crime."[191] But Michigan defines a juvenile as below the age of 17. Specifically, MCR 6.903(E) defines "juvenile" as "a person 14 years of age or older, who is subject to the jurisdiction of the court for having allegedly committed a specified juvenile violation on or after the person's 14th birthday and before the person's 17th birthday." Similarly, MCL 600.606(1) defines a juvenile as "14 years of age or older and less than 17 years of age," while MCL 764.27 references "a child less than 17 years of age." Consequently, to adhere to *Miller*, sentencing of a juvenile

---

[190] *Miller*, 567 US at ___; 132 S Ct at 2460.

[191] *Graham*, 560 US at ___; 130 S Ct at 2030, quoting *Roper*, 543 US at 574 (quotation marks omitted).

requires that those individuals between 17 and 18 years of age also be subject to the strictures as outlined herein.

## VII. CONCLUSION

The United States Supreme Court has, through a series of recent decisions culminating in *Miller*, indicated that juveniles are subject to different treatment than adults for purposes of sentencing under the Eighth Amendment. Specifically, we hold that in Michigan a sentencing court must consider, at the time of sentencing, characteristics associated with youth as identified in *Miller* when determining whether to sentence a juvenile convicted of a homicide offense to life in prison with or without the eligibility for parole. While *Miller* does not serve to "foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison."[192]

While *Miller* is applicable to those cases currently pending or on direct review, we find that in accordance with *Teague* and Michigan law that it (1) is not to be applied retroactively to cases on collateral review, such as Carp's, because the decision is procedural and not substantive in nature, and (2) does not comprise a watershed ruling. We urge our Legislature to address with all possible expediency the issues encompassed by and resulting from *Miller* that necessitate the revision of our current statutory sentencing scheme for juveniles.

In the interim, as guidance for our trial courts for those cases currently in process or on remand following

---

[192] *Miller*, 567 US at ___; 132 S Ct at 2469.

direct appellate review, we find that MCL 791.234(6)(a) is unconstitutional as currently written and applied to juvenile homicide offenders. When sentencing a juvenile, defined now as an individual below 18 years of age for a homicide offense, the sentencing court must, at the time of sentencing, evaluate and review those characteristics of youth and the circumstances of the offense as delineated in *Miller* and this opinion in determining whether following the imposition of a life sentence the juvenile is to be deemed eligible or not eligible for parole. We further hold that the Parole Board must respect the sentencing court's decision by also providing a meaningful determination and review when parole eligibility arises.

Affirmed.

FITZGERALD and WHITBECK, JJ., concurred with TALBOT, P.J.