# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
October 16, 2014

Plaintiff-Appellee,

v

No. 311169
Wayne Circuit Court
LC No. 10-005562-01-FJ

DEONTE HOWARD,

Defendant-Appellant.

Before: WILDER, P.J., and FORT HOOD and SERVITTO, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial conviction of first degree murder, MCL 750.316.[1] He was sentenced to a mandatory term of life imprisonment, with credit for 382 days served. We therefore affirm defendant's conviction, but remand for resentencing pursuant to MCL 769.25(1)(b)(i).

Defendant was charged with first degree premeditated murder, assault with intent to murder and felony firearm in connection with the shooting death of 19-year-old Tyrone Simpson on April 10, 2010. The shooting occurred in front of a combination convenience store/barbecue restaurant on the 1600 block of Tireman Street in the city of Detroit shortly after 4:00 p.m. An argument broke out between defendant, who was 16 years old at the time, and Simpson when Simpson accused defendant of taking his Cartier sunglasses. Defendant denied taking them and a verbal argument ensued. Simpson then punched defendant in the face several times, at which point defendant drew a weapon and fired at Simpson, injuring him and one of Simpson's friends, Aundrey Allen. Simpson attempted to run away from defendant, but defendant chased Simpson around a vehicle, shooting at and striking him with several shots until Simpson collapsed in the

---

[1] Defendant was initially charged with first degree murder, assault with intent to murder, MCL 750.83, and felony firearm, MCL 750.227b. At trial, the jury convicted defendant of felony firearm and the lesser included offense of assault with intent to do great bodily harm, MCL 750.84, but was hung with respect to the first degree murder charge, leading to retrial on that charge only. Defendant's retrial on the first degree murder charge is the focus of this appeal and we do not address his trial or, convictions, or sentences for felony firearm or assault with intent to do great bodily harm.

-1-

street. An SUV driven by an unidentified friend of defendant's then pulled up and defendant jumped into the back seat. The vehicle started to leave, and then abruptly slammed on its breaks. Defendant got back out of the vehicle and shot Simpson in the head. Defendant then got back into the vehicle and it sped away. Simpson was dead when police arrived on the scene a short time later. The medical examiner noted that Simpson had a total of nine gunshot wounds, including one to his head.

On appeal, defendant first contends that there was insufficient evidence to support his conviction. We disagree.

We review a challenge to the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the prosecution, to determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *People v Hawkins*, 245 Mich App 439, 457; 628 NW2d 105 (2001). "[A] reviewing court is required to draw all reasonable inferences and make credibility choices in support of the [trier of fact's] verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). Circumstantial evidence and reasonable inferences arising from the evidence may constitute satisfactory proof of the elements of the offense. *People v Warren (After Remand)*, 200 Mich App 586, 588; 504 NW2d 907 (1993).

Defendant challenges the sufficiency of the evidence on two grounds. First, he contends there was insufficient evidence identifying him as the shooter. The prosecution must prove the identity of the defendant as the perpetrator of a charged offense beyond a reasonable doubt. *People v Oliphant*, 399 Mich 472, 489; 250 NW2d 443 (1976); *People v Kern*, 6 Mich App 406, 409-410; 149 NW2d 216 (1967). Circumstantial evidence and reasonable inferences arising from the evidence may be sufficient to identify the accused as the perpetrator. *People v Nelson*, 234 Mich App 454, 459; 594 NW2d 114 (1999). The credibility of identification testimony is a question for the trier of fact that this Court will not decide over again. *People v Davis*, 241 Mich App 697, 700; 617 NW2d 381 (2000). And, a positive identification by witnesses may be sufficient to support a conviction of a crime. *Id.*

In this case, defendant was identified by no less than four eyewitnesses to the shooting. Frederick McFadden testified that he had an unobstructed view of the scene from approximately 20 feet away, and saw defendant shoot Simpson several times. His testimony was unequivocal that defendant was the only person with a gun and that defendant shot Simpson several times, including once in the head. As pointed out by defendant, McFadden testified at trial that he picked out defendant and the driver of a car from a photo array, which was different from his testimony in a prior trial that he picked out the shooter and two drivers. McFadden also described the shooter to the police as 20 to 24 years of age and 5"11 to 6" tall when defendant was 16 at the time of the shooting and is less than 5'6". However, the credibility of identification testimony is a question for the trier of fact. *Davis*, 241 Mich App at 700.

Marcario Harris and Kimberly Thompson, who live across the street from the store/restaurant where the shooting occurred, also identified defendant as the shooter. Both testified that they had a clear view of the shooting through their front living room window, which faced the store and they could clearly see defendant in the broad daylight. Both testified that defendant was only person they saw with a gun during the incident. Neither was asked to view a

photo array or participate in a live lineup, but identified defendant for the first time at trial. Both Harris and Thompson described the shooter to the police immediately after the event as around 5"9 or 5'10", thin, and in his mid-20's. This description is not so far off as to be a misidentification and moreover, the jury is responsible for both credibility and evidentiary weight determinations. *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010).

Aundrey Allen also identified defendant as the shooter. He had been standing with Simpson while Simpson was arguing with defendant about his glasses and when Simpson punched defendant in the face. Allen testified that he was also standing behind and somewhat to the side of Simpson when defendant pulled a gun out of his pocket and started shooting at Simpson. Allen was shot in the leg as he tried to run. Allen described the shooter to the police as being around 5'7" or 5'8" and around 17 or 18 years old. Allen also told the police that several people at the incident called the shooter "Tay," which others witnesses confirmed was defendant's nickname. At the hospital after his surgery, Allen did view a photo array and identify another person as the shooter. Allen explained, however, that he was under the influence of morphine at the time of that identification. Allen thereafter participated in a live line up and identified defendant out of the lineup as the shooter.

The above was sufficient for a reasonable jury to find beyond a reasonable doubt that defendant was identified as the shooter.

Defendant next argues that the evidence was insufficient to establish that there was a premeditated, deliberate intent to kill such that his first degree murder conviction cannot stand. MCL 750.316(1)(a) provides:

> (1) A person who commits any of the following is guilty of first degree murder and shall be punished by imprisonment for life:
>
> (a) Murder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing.

The elements of premeditated murder are (1) an intentional killing of a human being (2) with premeditation and deliberation. *People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009). With regard to premeditation and deliberation, this Court has explained:

> To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem. As a number of courts have pointed out, premeditation and deliberation characterize a thought process undisturbed by hot blood. While the minimum time necessary to exercise this process is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a "second look." [*People v Plummer*, 229 Mich App 293, 300; 581 NW2d 753 (1998) (citation omitted).]

"Premeditation and deliberation may be inferred from all the facts and circumstances, but the inferences must have support in the record and cannot be arrived at by mere speculation." *Id*. at 301. There is no specific period of time that must pass for premeditation to be found; however, "[o]ne cannot instantaneously premeditate a murder." *Id.* at 305. Neither premeditation nor

deliberation need be established by direct evidence; the required state of mind can be inferred from all of the facts and circumstances on the record. *People v Boose*, 109 Mich App 455, 473; 311 NW2d 390 (1981). These elements may also be shown by consideration of the following factors: " '(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and, (4) the defendant's conduct after the homicide.' " *People v Orr*, 275 Mich App 587, 591; 739 NW2d 385 (2007), quoting *People v Schollaert*, 194 Mich App 158, 170; 486 NW2d 312 (1992).

No one disputes that Simpson approached defendant accusing him of stealing his glasses. It also appears that Simpson escalated the verbal altercation to a physical level by punching the defendant and that defendant did not punch him back. However, by all accounts, defendant was the only one with a weapon and the only one who shot. Most important to our analysis, several distinct rounds of shooting occurred. First, after Simpson punched defendant several times in the face and was approaching to punch him again, defendant shot at Simpson at least twice. Allen, who was standing next to Simpson at the time the first shots were fired, testified that defendant initially shot at Simpson twice.

The second round of shots came almost immediately thereafter. Allen testified that after the first two initial shots, he ran toward the store. As he ran, he heard three more shots. Bobby Bailey, another witness, also ran to the store after the initial shots.

The next round of shots occurred when both Bailey and Allen were inside the store. Bailey testified that he heard six or seven more shots while he was in the store. Allen testified that, he too, heard additional shots while he was in the store. Allen testified that he heard eight or nine shots right in a row, then a several second pause occurred. Allen testified that he next heard Simpson begging for his life and a final, single shot. According to Allen, he thereafter heard the sound of a car being floored and taking off.

McFadden similarly testified to distinct rounds of shots. He testified the he heard three initial shots, and then his attention was drawn to an elderly lady getting out of her car in the street. McFadden had time to help the woman to her home before he heard the next shot, which he testified he heard while at the same time seeing Simpson stumble backward. McFadden testified that he then heard several more shots and Simpson was lying in the street. According to McFadden, the defendant fired two more shots at Simpson as he lay in the street then got into an SUV. Defendant then got back out of the SUV, said "This m—f—n--- isn't dead yet" and shot defendant several more times, including once in the head. Defendant then got back in the SUV and left.

Witness Harris, testified that he saw defendant chasing Simpson around a Suburban, shooting at him. After Simpson fell to the ground, defendant walked toward him and shot at him several more times. Harris testified that defendant shot at Simpson approximately 15 times. Witness Thompson testified that defendant first shot at Simpson while both were in the street and Simpson fell to the ground. Defendant then got into an SUV and started to take off, then abruptly got back out of the vehicle when Simpson started to get up. Thompson testified that defendant chased Simpson around shooting at him. She heard Simpson begging for his life and saw defendant walk up to Simpson, shoot him in the head, and then get back into the SUV and leave.

The prosecution presented sufficient evidence of premeditation and deliberation to support defendant's first degree premeditated murder conviction. The first shots fired by defendant could qualify as being brought about by "hot blood" without an opportunity to take a second thought. Simpson had just punched defendant in the face several times and was advancing toward him again. Allen testified that at that point, defendant started reaching for his pocket "real crazy like." Were those the only shots fired, defendant's argument that his actions were rash, impulsive or a hot-blooded reaction to the circumstances would have some merit. However, the testimony establishes that after the initial few shots, there was a minimum of a several second pause as Allen and others fled the scene. The pause was long enough, if McFadden's testimony is to be believed, for him to assist an elderly lady from her car parked in the street up to her house and for him to then return to the street and witness the next round of shots. Allen testified that he could see Simpson's hand go toward his stomach as though he had been shot in that area. McFadden also testified that after one of the first several shots, he saw Simpson stumble backward. By all witness accounts, then, Simpson was still alive after the first shots were fired. Assuming defendant did not possess the requisite intent (premeditation or deliberation) to murder at the time the first shots were fired, he could have left at that point and the incident perhaps would have been over.

However, after a pause, more shots were fired and, by all witness accounts, Simpson was still alive. According to Harris and Thompson, it was at that point that defendant got into an SUV and appeared to be about to leave the scene, but when Simpson started to get up out of the street, the SUV slammed on its brakes and defendant got back out. According to these witnesses, defendant chased Simpson around a vehicle, firing more shots at him until he fell back into the street, then walked up to him and fired a final shot into his head. While McFadden made no mention of defendant chasing Simpson around a vehicle as he fired shots at him, he did testify that defendant got into an SUV, then got back out, said "This m—f—n--- isn't dead yet" and shot defendant several more times, including once in the head. The medical examiner testified that when the shot to his head was delivered, Simpson was still alive.

A reasonable jury could find that between the apparently non-fatal first shots and the final shot to Simpson's head, there was sufficient time for defendant to take a second look at the nature of his actions. Defendant may have had no prior relationship with Simpson and may not have initially gone to the store/restaurant for anything other than his stated purpose of finding his phone. Nevertheless, the circumstances of the killing itself show that defendant thought about taking Simpson's life before the he took the acts which actually caused the death and pondered the acts for some, albeit small, amount of time. Defendant then got into an SUV and the vehicle started to leave. But it then stopped as Simpson started to get up and defendant elected to shoot Simpson several more times while at least one witness testified that defendant made a statement concerning an intent to kill Simpson and while other witnesses testified they heard Simpson pleading with defendant for his life. Defendant then stood over Simpson while he lay in the street and shot him in the head. The location of this final shot, the positions of the parties, and the fact that defendant halted and got out of vehicle to deliver the final shots adequately suggest that although defendant had time to take a second look and perhaps leave Simpson injured, defendant deliberately chose to ensure that he killed Simpson. Thus, even if defendant did not form a homicidal intent until he stopped the SUV and got back out to deliver the final round of shots, the time span between that moment and the time the initial shots were fired would be of a

sufficient amount to allow defendant to take a second look. There was thus sufficient evidence of premeditation and deliberation to support defendant's first degree murder conviction.

Defendant next argues that he was deprived of the right to the effective assistance of counsel. We disagree. Defendant did not bring a motion for a new trial on the basis of ineffective assistance of counsel, and failed to request a *Ginther* hearing (*People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973)) before the trial court. Accordingly, defendant's claim of ineffective assistance of counsel is unpreserved and we review his claim for mistakes apparent on the record. *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002).

An ineffective assistance claim "is a mixed question of fact and constitutional law. A judge must first find the facts, then must decide whether those facts establish a violation of the defendant's constitutional right to the effective assistance of counsel." *People v Grant*, 470 Mich 477, 484; 684 NW2d 686 (2004). To merit a new trial because of ineffective assistance of counsel, the defendant has the heavy burden of demonstrating that defense counsel's performance was so deficient that he was not functioning as constitutionally guaranteed "counsel" and that defense counsel's performance prejudiced the defendant to the extent that it is reasonably probable that the outcome of the proceedings would have been different. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001), quoting *Strickland v Washington*, 466 U S 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). To prevail on a claim of ineffective assistance of counsel, then, defendant must prove two components: (1) that counsel's performance was deficient and that, under an objective standard of reasonableness, counsel made an error so serious that he was not performing as the attorney guaranteed by the constitution and (2) prejudice. *People v Pickens*, 446 Mich 298, 302-303; 521 NW2d 797 (1994); *Strickland*, 466 US at 687. To satisfy the first component, defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, *supra* at 687. The second component requires the defendant to show "the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *Carbin*, 463 Mich at 600. Defendant must overcome the presumption that the challenged conduct might be considered sound trial strategy and must further show that he was prejudiced by the error in question. *Pickens*, 446 Mich at 312-314. That a particular trial strategy does not work does not necessarily constitute ineffective assistance of counsel. *Id*. at 61.

Defendant directs us to three instances that he claims amount to ineffective assistance on trial counsel's part. First, defendant asserts that counsel was deficient in failing to call Sergeant Martel as a witness at trial to refute Allen's testimony that when he identified someone other than defendant as the shooter in a photo array while he was in the hospital, it was because he was under the influence of morphine. According to defendant, at his first trial, which resulted in a hung jury (and a mistrial) on the first degree murder charge, Martel's testimony had made it clear that Allen was coherent when he identified a Deonte *Miller* as the shooter and that based on Allen's identification, Martel prepared a search warrant for Miller's home. Defendant contends that Allen's identification of him as the shooter was critical to the prosecution's case and, as such, it was critically important for defense counsel to properly challenge Allen's testimony through Martel.

At defendant's first trial Allen testified that on the date of the incident, when he first had contact with the police, he was in the hospital and "had like a lot of morphine inside me." Allen

testified that he was unable to write at that time and the officers asked him to explain what had happened. Allen testified that officers also showed him six photographs and that he was able to identify someone in the photographs but that he does not know who he identified because "at the time . . . I was so out of it." Allen testified that he identified the person who looked closest to defendant because he really did not know defendant. It is undisputed that Allen identified someone other than defendant as the shooter in the photo array.

Martel testified that he was not in the room when Allen made an identification of someone in the photo lineup. He testified that he also took a statement from Allen. He testified that Allen may have been on some medication or painkillers when he gave the statement to Martel, but that Allen seemed coherent. Martel testified that he would not have taken his statement had he not believed Allen to be coherent.

It is true that Martel's testimony would have placed doubt on Allen's testimony that he mistakenly identified someone other than defendant in the photo lineup due to drug intoxication. However, decisions on whether to call or question witnesses are presumed to be matters of trial strategy that will not be second-guessed on appeal. *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008). Even if counsel's failure to call Martel as a witness was in error, it cannot be said to have been outcome determinative. This is necessarily so, as Allen participated in a live lineup after being released from the hospital and identified defendant, who was irrefutably part of that lineup, as the shooter. Thus, Allen's later positive identification of defendant as the shooter would likely have negated any effect of his initial photo identification of another person as the shooter. Thus, counsel did not render ineffective assistance in failing to call Martel as a witness.

Defendant next contends that counsel was ineffective for failing to enter a stipulation that was entered at his first trial—that Detective Myron Love would testify that he showed McFadden a photo lineup; that defendant's picture was not included in the photo lineup; that McFadden picked out three people, and; that Love did not remember who McFadden picked out.

It is not clear from the record why the above stipulation was entered. However, it is clear that Love appeared at defendant's second trial and testified. Thus, a stipulation as to what he would have testified to was obviously not an option at that point. Defendant has also provided nothing to indicate that defense counsel failed to request the same stipulation, rather than that he perhaps sought the same stipulation and was denied the opportunity to present it at trial instead of Love's live testimony. Given the above, it cannot be found that counsel was ineffective for failing to procure the stipulation.

Moreover, the only way in which Love's testimony at trial differed from the stipulation was that at defendant's trial, Love testified that he *was unsure* whether defendant's photo was included in the photo array and the stipulation provided that defendant's photo *was not* in the photo array. While defendant makes much of this distinction and contends that the difference was significant in undermining McFadden's testimony at trial that he was positive he picked defendant's photo out of the photo array, defense counsel elicited from Love that had McFadden picked defendant out of a photo array they would have had documentation of the same and they did not. Thus, counsel effectively undermined McFadden's credibility in asserting that he had picked defendant out of a photo lineup despite the difference between the stipulation and the live

testimony. Defense counsel was thus not ineffective in failing to procure the same stipulation regarding Love's testimony that was presented at his first trial.

Defendant also argues that counsel was ineffective in declining to cross-examine investigator Simon. At his first trial, defendant points out that his trial counsel cross-examined Simon regarding her treatment of people she has interrogated. Counsel elicited that Simon had lied to suspects during interrogations, had cursed at them, and had told them if they did not talk they were going to jail. Counsel asked Simon if she had threatened witness Bobby Bailey during her questioning of him and Simon denied threatening him, telling him to shut up, or threatening to ruin his business because he did not tell her what she wanted to know. While defendant argues that Simon's alleged threats were an important piece of the defense theory that the police engaged in misconduct, defendant has identified no other alleged acts of misconduct on the part of the police or further explained how any theory of misconduct was conveyed to the jury and influenced or was intended to influence his case. And, any admissions that first trial counsel elicited form Simon about any untoward treatment of persons she questioned was limited to treatment of *suspects*—not of witnesses such as Bailey.

Additionally, because Simon unequivocally denied making any threat in any form to Bailey in the first trial, it was reasonable for defense counsel at defendant's second trial to conclude she would testify consistently and deny any wrongdoing. And on direct examination by the prosecution, she, in fact, did. Thus, it would be a reasonable trial strategy to elicit from Bailey, as defense counsel did, that Simon had threatened him and that Bailey had just agreed to whatever she said due to the threats, that Simon told him to shut up and would not let him talk and just wanted to make the shooter defendant, and let those accusations stand unanswered by Simon to the greatest degree possible. Though the prosecutor asked Simon on direct whether she had threatened Bailey during her questioning of him and she again denied making any threats, there would be nothing gained by defense counsel again asking her the same questions and having her reiterate her denials. This Court will not substitute its judgment for trial counsel's in matters of trial strategy. *People v Avant*, 235 Mich App 499, 508; 597 NW2d 864 (1999).

Defendant's next argument on appeal is that his conviction was obtained through the use of false and/or perjured testimony, thus denying him his due process rights. Specifically, defendant contends that witness McFadden testified at the second trial that he was positive he identified defendant in a photo array and that this testimony is contrary to the stipulation entered in the first trial of Detective Love that defendant was not in the photo array and of Love's testimony in the second trial that if McFadden had identified defendant, there would have been documentation of the same. Defendant asserts that, similarly, Love's testimony at the second trial that he was unsure whether defendant's photo was in the array was false and/or perjured as it contrasted with the stipulation in the first trial that defendant's photo was not in the array. We review this unpreserved allegation of constitutional error for plain error affecting the defendant's substantial rights. *People v Carines*, 460 Mich 750, 763–764; 597 NW2d 130 (1999).

A conviction obtained through the knowing use of perjured testimony offends a defendant's due process protections guaranteed under the Fourteenth Amendment. *Mooney v Holohan*, 294 US 103, 112; 55 S Ct 340; 79 L Ed 791 (1935); *Napue v Illinois*, 360 US 264, 269; 79 S Ct 1173; 3 L Ed 2d 1217 (1959); *People v Aceval*, 282 Mich App 379, 389-390; 764 NW2d 285 (2009). If there is any reasonable likelihood that the false testimony could have affected the

judgment of the jury, the conviction must be set aside. *Aceval*, 282 Mich App at 389-390. Stated differently, a conviction will be reversed and a new trial will be ordered, but only if the tainted evidence is material to the defendant's guilt or punishment. *Id*.

Michigan courts have also recognized that the prosecutor has a duty to correct false evidence. See *People v Herndon*, 246 Mich App 371, 417; 633 NW2d 376 (2001). But the mere fact that a witness's testimony conflicts with earlier statements does not establish that a prosecutor knowingly presented perjured testimony. *People v Parker*, 230 Mich App 677, 690; 584 NW2d 753 (1998). Perjury requires a material, willful false statement. *In re Contempt of Henry*, 282 Mich App 656, 677–678; 765 NW2d 44 (2009).

There is no indication in the record that the prosecutor, who was the same person for both trials, concealed any prior contradictory statements or elicited and allowed perjured testimony to stand, or even that the statements were, in fact contradictory or perjured. With respect to Love, as previously indicated, a stipulation was entered in the first trial that ". . . if Detective Myron Love showed, the testimony would be Detective Myron Love showed Frederick McFadden a photographic line-up regarding the shooting of Tyrone Simpson. In front of Detective Love, Frederick McFadden picked out three people. Detective Love does not remember who Frederick McFadden identified, but Deonte Howard was not one of those people." The prosecutor added, "He was no[t] in the line-up." At this point defense counsel stated, "Right. Deonte Howard was not in the photographic line-up that was shown to Frederick McFadden . . . ." The prosecutor stated, "That's correct, Judge. And I've sign[ed] the document to that effect."

At defendant's second trial, Love appeared as a witness and testified that he showed a photo array with six photos to McFadden. When advised that there were two different suspects involved in the case, Love indicated that he believed he was involved with the first suspect [Deonte Miller]. Love testified that when shown the photo array, McFadden picked out three people that he indicated he recognized. Love further testified that he was "not really positive" if defendant's photo was in the photo array. Love testified that he did not have a copy of the photo array and he had no documentation to show that McFadden had picked defendant out of the photo array. Love testified that had McFadden picked out defendant, they would have had documentation of the same.

Clearly, Love was not in charge of what the prosecutor and defense counsel in the first trial placed on the record as far as the stipulation that defendant was not part of the photo array shown to McFadden. The prosecutor was the individual who volunteered this information as part of the stipulation so likely had a basis for making such a statement, but that would be bare speculation at this point. In any event, Love's live testimony at defendant's second trial does not *contradict* this stipulation. Instead, Love simply stated he was "not positive" whether defendant's photo was or was not part of the array, indicating a lapse of memory, not a material, willful false statement. See *In re Contempt of Henry*, 282 Mich App at 677–678.

Concerning McFadden, at defendant's first trial McFadden testified that he was shown three pages of pictures and that he picked out "the shooter and two drivers." At defendant's second trial, McFadden testified that he saw three pictures and that he picked out two people. McFadden specifically testified that he picked out defendant and the driver. He testified that he was "positive" that he picked out defendant in the photos. Notably, the prosecution did not ask

McFadden any questions about the photo identification on direct examination—it was defense counsel who elicited this information on cross-examination. In any event, comparing the testimony at the two trials, while there are some differences, the significant factor is the absence of any mention of defendant in McFadden's first testimony. McFadden did not testify at the first trial that he picked defendant out of the photo array; he testified that he picked out the shooter. Thus there is no conflict with respect to defendant in his testimony at defendant's second trial.

According to defendant, McFadden's testimony that he identified defendant as the shooter in the photo array is nevertheless clearly false. However, all inconsistencies were disclosed to the jury and it was for the jury to determine whether McFadden's trial testimony, including his alleged identification of defendant in a photo array, was credible. *People v Davis*, 241 Mich App at 700.

Were we to find that the testimony was, in fact, false, it cannot be concluded that the admission of the testimony affected the jury's verdict and thus the outcome of the trial. Not only did McFadden identify defendant in court as the shooter, several other eyewitnesses, whose credibility defendant does not challenge, also unequivocally identified defendant as the shooter.

Defendant's final argument on appeal is that the Supreme Court's ruling in *Miller v Alabama* __ US ___; 132 S Ct 2455; 183 L Ed 2d 407 (2012) prohibits a sentence of life without the possibility of parole imposed under a statutory scheme that requires mandatory life for those, such as defendant, who were juveniles at the time of the offense. We review this unpreserved constitutional issue for plain error affecting defendant's substantial rights. See *Carines*, 460 Mich 750, 764; 597 NW2d 130 (1999).

To avoid issue forfeiture under the plain-error rule, defendant must prove the following: (1) there was an error, (2) the error was plain, and (3) the plain error affected substantial rights, i.e., the outcome of the lower-court proceedings. *Id.* at 763. Once defendant has established these requirements, this Court "must exercise its discretion in deciding whether to reverse." *Id.* Reversal is warranted only if the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings or resulted in the conviction of an actually innocent person. *Id.*

In *Miller*, 132 S Ct 2455, the United States Supreme Court held that mandatory life imprisonment without the possibility of parole for those under the age of 18 when they committed a crime violated the Eighth Amendment's prohibition against cruel and unusual punishment. Looking to its precedents, the Supreme Court noted that it had historically treated juveniles differently from adults and, because of their lesser culpability, has barred capital punishments for juveniles and barred life imprisonment without the possibility of parole in non-homicide cases as violative of the Eighth Amendment's protection against cruel and unusual punishment. *Id*. at 2463-2465. The *Miller* Court further stated:

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or

dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. See, e.g., *Graham*[*v Florida*], 560 US 48, [at 78], 130 S Ct [2011], at 2032 [176 L Ed 2d (2010)] ("[T]he features that distinguish juveniles from adults also put them at a significant disadvantage in criminal proceedings"); *J.D.B. v North Carolina*, 564 US ——, 131 S Ct 2394, 2400–2401, 180 L Ed 2d 310 (2011) (discussing children's responses to interrogation). And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it. *Id*. at 2468.

In holding that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without the possibility of parole for juvenile offenders, the *Miller* Court specifically declined to hold that the Eighth Amendment requires a categorical bar on life without parole for juveniles. *Id.* at 2469. The *Miller* Court did, however require a sentencing court in juvenile homicide cases to "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id*.

A panel of this Court recently considered the applicability of *Miller* to Michigan juvenile homicide cases. In *People v Eliason*, 300 Mich App 293, 295; 833 NW2d 357 (2013), this Court reviewed a 14- year-old's appeal of his conviction for first degree premeditated murder and the mandatory sentence of life imprisonment without the possibility of parole that was imposed. Referencing *Miller*, this Court held that because the defendant's case was pending on direct review at the time *Miller* was decided, "therefore, *Miller* applies and defendant's mandatory sentence of life imprisonment without the possibility of parole constitutes cruel and unusual punishment under the Eighth Amendment*." Eliason*, 300 Mich App at 309. The *Eliason* Court also explained that a prior published Court of Appeals case discussing the effect of the *Miller* decision, *People v Carp*, 298 Mich App 472, 526–527; 828 NW2d 685 (2012), only determined that the "limited holding in *Miller* was that a juvenile cannot be *automatically* subjected to a punishment of life imprisonment without the possibility of parole" and that the actual holding in *Carp* was "that *Miller* did not apply retroactively to collateral challenges to sentences." *Eliason*, 300 Mich App at 309. The *Eliason* Court explained the remedy for juveniles convicted of homicide and sentenced to mandatory life in prison without parole after *Miller* as thus:

However, contrary to defendant's assertions, he is not entitled to a remand at which the trial court has unfettered discretion to impose a sentence for any term of years. In fact, he could still receive the same sentence on remand, as the *Miller* Court did not "foreclose a sentencer's ability" to sentence a juvenile in a homicide case to life imprisonment without parole, so long as the sentence "take[s] into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at ——, 132 S Ct at 2469. In other words, a trial court can still sentence a juvenile who committed a homicide to life in prison without the possibility of parole, so long as that sentence is an individualized one that takes into consideration the factors outlined

-11-

in *Miller. Id.* at ——, 132 S Ct at 2466–2467, 2471. We recognized as much in *Carp,* 298 Mich App at 525, where we opined in dicta that the rule from *Miller* "does not . . . imply that a sentencing court has unfettered discretion when sentencing a juvenile. Rather, the focus is on the discretion of the sentencer to determine whether to impose the harshest penalty of life without the possibility of parole on a juvenile convicted of a homicide offense."

Therefore, the only discretion afforded to the trial court in light of our first-degree murder statutes and *Miller* is whether to impose a penalty of life imprisonment without the possibility of parole or life imprisonment with the possibility of parole. *Carp,* 298 Mich App at 527. In deciding whether to impose a life sentence with or without the possibility of parole, the trial court is to be guided by the following nonexclusive list of factors:

(a) the character and record of the individual offender [and] the circumstances of the offense, (b) the chronological age of the minor, (c) the background and mental and emotional development of a youthful defendant, (d) the family and home environment, (e) the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressure may have affected [the juvenile], (f) whether the juvenile might have been charged [with] and convicted of a lesser offense if not for incompetencies associated with youth, and (g) the potential for rehabilitation. [ *Id.* at 532, citing *Miller*, 567 US at ——, 132 S Ct at 2467–2468 (quotation marks and citations omitted).]

However, in response to *Miller*, and after *Eliason* was decided, the Legislature enacted MCL 769.25 and MCL 769.25a which "significantly altered Michigan's sentencing scheme for juvenile offenders convicted of crimes that had previously carried a sentence of life without parole." *People v Carp*, 496 Mich 440, 456; 852 NW2d 801 (2014). These statutes became effective on March 4, 2014, and apply to a criminal defendant who is less than 18 at the time he or she committed an offense either after the effective date of the amendatory act added the statutes or was less than 18 prior to that effective date and (1) either the case was still pending in the trial court or the applicable time periods for direct appellate review had not yet expired or (2) on June 25, 2012, (the day before *Miller* was decided) the case was pending in the trial court or the applicable time period for direct appellate review had not yet expired. MCL 769.25(1)(a)(i) and (ii). The effect of MCL 769.25 is that juveniles who commit even the most serious of offenses are no longer sentenced under the same fixed sentences as adults who commit the same offenses may be sentenced. Under this new law, absent a motion by the prosecutor seeking a sentence of life without parole, "the court shall sentence the individual to a term of imprisonment for which the maximum term shall be not less than 60 years and the minimum term shall be not less than 25 years or more than 40 years." MCL 769.25(4) and (9); *Carp*, 496 Mich at 458. If the prosecutor files a motion seeking life imprisonment without the possibility of parole for the allowed enumerated offenses, the trial court must hold a hearing, at which it must consider the factors listed in *Miller* and shall specify on the record any reasons supporting the sentence imposed. MCL 769.25(6) and (7). *Carp*, 496 Mich at 458-459.

More recently, in *Carp*, our Supreme Court considered the *Eliason* decision. That case, when consolidated with *People v Carp*, unpublished opinion per curiam of the Court of Appeals

-12-

issued November 15, 2012, (Docket No. 307758) and *People v Davis*, unpublished order of the Court of Appeals, entered June 15, 2000, (Docket No. 224046), called upon our Supreme Court to determine whether *Miller* should be applied retroactively to cases in which the defendant's sentence became final for purposes of direct appellate review before *Miller* was decided and (2) whether the Eighth Amendment of the United States Constitution or Const 1963, art 1, § 16 categorically bars the imposition of a life-without-parole sentence on a juvenile homicide offender. Our Supreme Court decided both questions in the negative. Relevant to the instant matter, however, the Supreme Court determined that while resentencing was indeed the proper directive in *Eliason*, the trial court was not, as the Court of Appeals in *Eliason* indicated, afforded with only the discretion to impose a penalty of life imprisonment without the possibility of parole or life imprisonment with the possibility of parole. Instead, because the defendant's case was on direct review at the time *Miller* was decided, he was entitled to resentencing pursuant to MCL 769.25(1)(b)(ii). The Supreme Court noted that:

> Under MCL 769.25(9), the default sentence for a juvenile convicted of first-degree murder is a sentence of a term of years within specific limits rather than life without parole. A juvenile defendant will only face a life-without-parole sentence if the prosecutor files a motion seeking that sentence and the trial court concludes following an individualized sentencing hearing in accordance with *Miller* that such a sentence is appropriate. MCL 769.25(2) through (7). *Carp*, 496 Mich at 528.

In this case, defendant committed the crime at issue when he was 16 years old and was sentenced on May 27, 2011, when he was 17 years of age. Due to a court error, it became necessary for the trial court to enter an order to reinstate his claim of appeal on May 31, 2012.[2] Defendant thereafter filed his timely claim of appeal on July 5, 2012. Because defendant's time for filing an appeal had not expired when *Miller* was decided (June 25, 2012), he is entitled to resentencing pursuant to MCL 769.25(1)(b)(i). See, *Carp*, supra.

We therefore affirm defendant's convictions, but remand for resentencing pursuant to MCL 769.25(1)(b)(i). We do not retain jurisdiction.

/s/ Kurtis T. Wilder
/s/ Karen M. Fort Hood
/s/ Deborah A. Servitto

---

[2] Defendant signed a written request for appellate counsel on May 31, 2011, but, for reasons unknown, this form request was not processed by Wayne County. In January 2012, defendant wrote to the trial judge, again requesting the appointment of appellate counsel. His request and appeal were properly pursued at that point and his appeal, though now technically untimely through no fault of his own, was regarded as a claim of appeal.